966 P.2d 1252 (1998)
136 Wash.2d 811
The STATE of Washington, ex rel. the WASHINGTON STATE CONVENTION AND TRADE CENTER, Respondent,
v.
Julia M. EVANS, Robert J. Evans, Millie Evans, John P. Lycette, JR., Trustee under the Will of Robley H. Evans, deceased, Julia M. Albee, John Doe Albee, Dina Corporation, Diller Associates, Earl B. Diller Trust, Hertz Corporations, McLean Family Limited Partnership, Robert J. Allerdice, Charles R. Carey Trust, Estate of Charles R. Carey, Mary V. Sparks, John Doe Sparks, William J. Boyce, Jeanne P. Boyce, the Adele Keller Family LTD. Partner Ship, Yen Lui Studios, Inc., Appellants.
No. 65607-0.
Supreme Court of Washington, En Banc.
Argued May 12, 1998.
Decided November 12, 1998.
*1253 John P. Lycette Jr., William J. Boyce, Thomas J. Greenan, Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, Janet G. Lim, Snook & Bolton, Robert B. Spitzer, Garvey, Schubert & Barer, Seattle, Linda M. Youngs, Hanson, Baker, Ludlow & Drumheller, Bellevue, for Appellants.
Christine Gregoire, Atty. Gen., Robert A. Wright, Asst. Atty. Gen., Olympia, John R. Ellis, Asst. Atty. Gen., Seattle, for Respondent.
DURHAM, C.J.
Property owners challenge a King County Superior Court order adjudicating public use and necessity that authorizes the State to condemn their property for expansion of the Washington State Convention and Trade Center (Convention Center or Center). At issue is whether the State may exercise the power of eminent domain under article I, section 16 (amendment 9), given the anticipated partial private use of the condemned property. We hold that the State may use the power of eminent domain to acquire the property for the Convention Center expansion project because the State seeks to condemn no more propertythan would be necessary to accomplish the purely public component of the project.

FACTS
The Convention Center plans to construct 110,000 square feet of new heavy load exhibit space. The Legislature approved the use of eminent domain to acquire property for the *1254 expansion and approved a grant of $111.7 million dollars of State funding. The Legislature conditioned this grant on the Center's ability to raise $15 million in outside governmental or private funding. RCW 67.40.180. The Washington State Convention and Trade Center Board (WSCTC Board) formed a task force to examine expansion possibilities, which narrowed the options down to either an addition to the east of the current facility or an addition to the north.
The east expansion alternative would extend onto the First Hill neighborhood, across Hubbell Place and the Union Street right-of-way to Terry Avenue. Four residential apartment buildings would be demolished, causing a total loss of 394 mixed-income housing units. Convention Center operations would be shut down for between six months to a year while current physical plant structures were being relocated.
The north expansion site would extend the existing Convention Center across Pike Street and Eighth Avenue. A 127-unit apartment tower, a condominium/garage structure, six parking lots, and a rental car outlet would be displaced. The current exhibit space sits roughly four stories above ground at Eighth Avenue. In order to be contiguous to the current exhibit space, a north expansion would likewise sit four stories above street level. The north alternative would thus create surplus ground level space that the Center could lease or sell to reach the $15 million in outside contribution required by the Legislature.
The task force evaluated both options and considered the financial requirements, community impact, and effect on urban fabric of each alternative. The task force preferred the north alternative, basing its decision, in part, on social and architectural concerns. However, one compelling factor in the decision to choose the north alternative was the State's ability to meet the legislative outside contribution requirement by leasing or selling the surplus space created underneath the north expansion. The WSCTC Board adopted these findings and designated the north site as the preferred alternative.
The Convention Center then solicited proposals for private development in the space below the proposed north expansion. R.C. Hedreen Company (Hedreen) submitted a development plan that was eventually chosen by the Center as the most suitable to its needs. The Board entered into an Option, Purchase and Development Agreement with Hedreen. Under this agreement, Hedreen will contribute the $15 million required for legislative approval of the project. Hedreen also will build the outer shell of the Convention Center. This shell will be supported by huge foundation columns, extending from the exhibit hall to the ground, which will be stabilized by interstitial floors. Also, numerous stairways, utility runs, and other support facilities will intrude down into the space underneath the exhibit hall. In return, Hedreen will take fee simple title to the remaining space below the Convention Center for construction of retail and parking, and will construct a hotel tower in the northwest corner of the parcel (on land already owned by the convention center and not subject to these eminent domain proceedings).
The Convention Center instituted condemnation proceedings pursuant to RCW 67.40.020 and RCW 8.04 to acquire fee simple title to nine tracts of land in the north expansion area. One property owner granted immediate use and possession. The remaining property owners challenged the condemnation. They argued that the State was impermissibly seeking to condemn their property for private use. The property owners also argued that the decision to choose the north site based on the possibility of private funding was arbitrary and capricious.
The Superior Court, in its amended and final findings of fact and conclusions of law, ruled in favor of the Center and entered an order adjudicating public use and necessity. The Court found that (1) the expansion of the Convention Center is a public purpose; (2) the exhibit space would cover the entire area of the nine parcels sought to be condemned; (3) the Center will be making a public use of the exhibition space, the support columns, and stairwells, and the lateral flooring; and (4) the area beneath the hall and between the columns will be created as an inevitable consequence of constructing the public space, and must be leased to another entity or *1255 remain empty. The court also found that in order to be successful as an exhibit hall, the exhibit area must be open and cannot be penetrated by support columns. Thus, no structure can be built above the exhibit hall space. This structural requirement precludes access to the air rights above the exhibit hall and, therefore, such air rights would be taken for purely public purposes.
Based on these findings, the court concluded that the volumetric ratio of private use to public use is approximately 20 percent to 80 percent. The court thus held that the private use would accompany the public use in a subordinate way, and that sale of the space to private users to prevent waste is an incidental use. The court also held that the expansion to the north site rather than the east site was necessary. The north option dislocated fewer housing units and the Convention Center could continue operating during construction. Were the east site chosen, it would require the relocation of mechanical and utility functions resulting in a shutdown of the convention center for six months to a year.
The property owners appealed the trial court's order and the case was transferred to this court for direct review.

ANALYSIS
The power of eminent domain is an inherent power of the state. Miller v. City of Tacoma, 61 Wash.2d 374, 382, 378 P.2d 464 (1963). This power is limited by both the Washington State Constitution and by statute. Article I, section 16 (amendment 9) prohibits the State from taking private property for private use. RCW 8.04.070 requires that a proposed condemnation be necessary for the public use. This court has developed a three-part test to evaluate eminent domain cases. For a proposed condemnation to be lawful, the State must prove that (1) the use is public; (2) the public interest requires it; and (3) the property appropriated is necessary for that purpose. In re City of Seattle, 96 Wash.2d 616, 625, 638 P.2d 549 (1981) (citing King County v. Theilman, 59 Wash.2d 586, 593, 369 P.2d 503 (1962)). Property owners challenge the present condemnation on the first and third grounds. They argue that the expansion project is not "for public use" because Hedreen's participation creates an impermissible mix of public and private uses. They also argue that the adoption of the north alternative was not necessary given the availability of an east alternative that did not involve private participation.
Public Use
The constitution prohibits the taking of private property for a private use. However, this language does not create a blanket prohibition on the private use of land condemned by the State. As long as the property was condemned for the public use, it may also be put to a private use that is merely incidental to that public use. Chandler v. City of Seattle, 80 Wash. 154, 159, 141 P. 331 (1914); City of Tacoma v. Nisqually Power Co., 57 Wash. 420, 428, 107 P. 199 (1910). The property owners concede that the exhibit hall space will be put to a public use. The question then is whether Hedreen's participation in the expansion project corrupts the public nature of the project, or whether it is merely incidental.
The property owners argue that Hedreen's involvement in the project is not incidental. They rely on In re City of Seattle, 96 Wash.2d 616, 638 P.2d 549 (1981) (Westlake) for the proposition that a private use is not incidental if the public and private uses are combined "in such a way that the two cannot be separated." Westlake, 96 Wash.2d at 627, 638 P.2d 549. The property owners argue that the expansion project depends upon Hedreen's participation to meet legal and architectural requirements in such a way that the public and private spaces cannot be separated. Property owners err in their interpretation of Westlake and its application to the facts of this case.
Westlake involved the proposed acquisition of the properties that now constitute the Westlake Mall in Seattle. The City of Seattle intended to create a downtown urban focal point in order to forestall the decay experienced by other cities' retail cores. To this end, the City attempted to condemn several parcels of land. The City planned to construct a park on part of the land acquired, *1256 and deed the rest of the land to a private developer, who would build a mall, a monorail terminal, and museum space.
Several property owners challenged the condemnation. On discretionary review, this court analyzed the mixed uses in the plan and observed that the retail shops were a substantial element of the project, essential to its functioning. The court stated that "[i]f a private use is combined with a public use in such a way that the two cannot be separated, the right of eminent domain cannot be invoked." Westlake, 96 Wash.2d at 627, 638 P.2d 549 (citing State ex rel. Puget Sound Power & Light Co. v. Superior Court, 133 Wash. 308, 233 P. 651 (1925)).
The court held that the use of the power of eminent domain to acquire the land was unconstitutional because the project did not constitute a public use. The court explained:
The City strenuously argues that since it has the statutory authority to condemn land for public squares, parks or museum purposes ..., this project is a public use. Were the retailing functions only incidental to those uses, a different question would be presented. However, the evidence shows, as the trial court found, that the primary purpose of the undertaking was to promote the retail goal.
Westlake, 96 Wash.2d at 629, 638 P.2d 549.
The property owners argue that the facts in Westlake are substantially similar to those presented by the Convention Center expansion. The expansion and the retail development are financially interdependent. The statute authorizing the expansion provides that the project may not proceed without outside funding. Property owners reason, therefore, that the investment of $15 million by Hedreen is the "sine qua non" to the WSCTC's ability to proceed with the project. Thus, the public and private uses are combined in such a way that they cannot be separated. We disagree.
First, contrary to the property owners' assertions, private funding of a public project does not necessarily corrupt the public nature of that project. Appellants fail to cite any cases to support their argument that private contribution to a project's expenses defeats the exercise of eminent domain. On the contrary, in Town of Steilacoom v. Thompson, 69 Wash.2d 705, 419 P.2d 989 (1966), this court affirmed a finding of public use and necessity where a private developer advanced funds for condemnation awards and financed a public sewer extending to his development. Private funding of a public project alone is not sufficient to defeat the State's exercise of the power of eminent domain.[1]
Second, unlike Westlake, the retail development in this case is not a primary purpose of the project. In Westlake, the City sought to condemn property to create a downtown retail focal point. One primary purpose of the project was to revitalize the downtown retail core, and its success hinged on the construction of the private retail space. The court observed that not only was the mall a substantial element of the project, it was "essential to its functioning." Westlake, 96 Wash.2d at 628, 638 P.2d 549. Condemnation was improper in Westlake because the project for which the land was to be condemned was predominantly private in nature.
In this case, the trial court found that the purpose of the Convention Center expansion is to expand the exhibit space, and that the new exhibit space will constitute a public use. The retail development of the floors beneath the expansion in no way affects its functioning as an exhibit space. The independence of the two projects is evidenced by the fact that if this court were to find for the property owners, the State could condemn the same land for the north expansion absent Hedreen's *1257 participation.[2] Without the private development, the State could build the same exhibit hall, on the same property, hovering at the fourth story level on the same support columns. The project could go forward without private participation in entirely the same manner, except that three stories of vacant space would lie unused underneath the structure. Thus, the private development in this vacant space is a separable component of the expansion project. Hedreen's participation is a means to an end, but it is not an end in and of itself.
Finally, the property owners place mistaken emphasis on Westlake's statement that public and private uses may not be "combined... in such a way that the two cannot be separated." Westlake, 96 Wash.2d at 627, 638 P.2d 549. Westlake gleaned this test from a series of power plant cases decided in the early 1900s. These cases ruled on the use of eminent domain where land was to be condemned for the purpose of creating a single facility with both public and private uses. See, e.g., State ex rel. Puget Sound Power & Light Co. v. Superior Court, 133 Wash. 308, 233 P. 651 (1925); Chandler v. City of Seattle, 80 Wash. 154, 141 P. 331 (1914); City of Tacoma v. Nisqually Power Co., 57 Wash. 420, 107 P. 199 (1910); State ex rel. Harris v. Superior Court, 42 Wash. 660, 85 P. 666 (1906). The framework created by these cases is not helpful here because the expansion project does not contemplate alternate public and private use of the same facility. Rather, the expansion project will consist of two entirely separate facilities, one wholly public, the other wholly private.
In Puget Power, the State sought to condemn land for a power plant that was to supply electricity to public and private consumers.[3] In order to determine the ultimate nature of the use for which the land was to be condemned, the court compared the amount of each use, and examined whether the two uses were both integral to the decision to condemn the land. In effect, the court examined whether the public use alone was sufficient to justify the condemnation. The court looked "`to the substance rather than the form, to the ends rather than to the means'" and held that
[t]here is neither allegation nor finding in this case that there is at this time, or according to any anticipated need for the near future, any necessity for the taking of this property for public use. On the contrary, it appears clearly that if there is any necessity whatever for acquiring the property it is for the prosecution of uses that are both public and private and which are combined in such manner that they may not be separated.
Puget Sound Power, 133 Wash. at 312, 314-15, 233 P. 651.
The power plant cases all dealt with commingled public and private uses. Where a joint public/private facility served dual purposes, the court was faced with the task of determining whether the condemnation served a public or private use. Thus, the court attempted to discern whether the project was of a predominantly public or private nature. These cases emphasized that some private use of condemned land is permissible as long as the private use is not itself the impetus for the condemnation.
"[I]f a private use is combined with a public one in such way that the two could not be separated, that the right of eminent domain may not be invoked to aid the joint enterprise. We mean by this, that the two purposes must together exist as main, or principal, ones; but where the private purpose is simply an incident, and the public use the principal, then the incident will not destroy or defeat the principal."
Nisqually Power Co., 57 Wash. at 428, 107 P. 199 (quoting Lake Koen Navigation, Reservoir & Irrigation Co. v. Klein, 63 Kan. 484, 497, 65 P. 684 (1901)).
*1258 The power cases were distinctive in that the condemnation was for a single facility that had alternating public and private uses. These cases are thus factually dissimilar to the present case. The Convention Center expansion is not a commingled public/private use. Instead, it is two distinct facilities: an exhibit hall and ground level retail. The expansion project contemplates a wholly public facility stacked above a wholly private development. Thus, although the Hedreen development is an integral part of the expansion plan, under the framework created by Westlake and the power cases, the two uses are not combined in such a way that they cannot be separated.
However, this initial determination that the two uses are not so combined cannot alone validate the State's use of eminent domain. We must still examine whether the Hedreen development is incidental to the expansion project. Article I, section 16 prohibits the taking of private property for private use. Thus, this court must ensure that the entire parcel subject to the eminent domain proceedings will be employed by the public use. The relevant inquiry is whether the government seeks to condemn any more property than would be necessary to accomplish purely the public component of the project. If the anticipated public use alone would require taking no less property than the government seeks to condemn, then the condemnation is for the purpose of a public use and any private use is incidental.
Applying this rule to the present case, we hold that the expansion project is a public use, and that the Hedreen development is merely incidental. The new exhibit space is a public use, and its footprint spans the entire property to be condemned. Because the expansion alone would require taking no less property than the government seeks to condemn, the Hedreen development in the space beneath the exhibit hall is merely incidental.
Necessity
In order for the State to invoke the power of eminent domain, the land must not only be taken for a public use, but also the property appropriated must be necessary for the public use. City of Tacoma v. Welcker, 65 Wash.2d 677, 399 P.2d 330 (1965). Appellants argue that, given the availability of the east alternative where private development is not feasible, the decision to expand on the north site based on the availability of co-development was arbitrary and capricious.
The nature of the determination of public necessity, and thus the standard of judicial review of a declaration of public necessity, differs from that applied to a declaration of public use. Unlike a determination of public use, questions concerning whether an acquisition is necessary to carry out a proposed public use are legislative. Thus, a determination of necessity by a legislative body is conclusive in the absence of proof of actual fraud or such arbitrary and capricious conduct as would constitute constructive fraud. Welcker, 65 Wash.2d at 684, 399 P.2d 330.
The property owners have not presented facts that would amount to fraudulent behavior by WSCTC. Fraud or constructive fraud would occur if the public use was merely a pretext to effectuate a private use on the condemned lands. This court has not previously enumerated factors to consider when determining whether a public use is truly necessary, but some relevant considerations are the dollar contribution of the private party, the percentage of public versus private use, and whether the private use is occurring in an architectural surplus of usable space.
There is no indication in this case that the State is using the exhibit hall expansion as a pretext in order to condemn the land for private use. Hedreen is contributing only $15 million to a project requiring well over a $100 million investment. Hedreen will be occupying a majority of the developed space. However, the trial court correctly observed that, given the structural requirements of the exhibit hall, the buildable airspace above the Center must be left vacant and is thus taken for the public use. Including the airspace, 80 percent of the usable area will be occupied by a public use. Finally, the area to be occupied by Hedreen will be created due to structural requirements of the exhibit hall. Because the heavy load exhibit space must be contiguous *1259 to the existing exhibit hall, it must be built on the fourth story level. Several floors of surplus space thus will be created out of architectural necessity. This area not needed by the Convention Center would lie vacant without private participation.
The property owners contend that the decision to expand north was arbitrary and capricious because it was based on the private development options presented by the north expansion. Although this was one basis for the WSCTC Board's choice of the north site, it was not the sole justification. Indeed, the trial court found that several other factors, in addition to the private development potential, motivated the election of the north site over the east site: (1) the building on the east site would have required dislocation of many more low income residential units; (2) the relocation of mechanical and utility functions on the east site would have required a shutdown of the Convention Center for many months; and (3) further future expansion would not be possible on the eastern site. Appellants do not challenge these findings.
Given the existence of these other factors justifying expansion to the north, the trial court correctly concluded that the Convention Center's decision to expand north was not arbitrary and capricious.

CONCLUSION
The Hedreen development is not combined with the expansion project in such a way that the two cannot be separated, nor is the State seeking to condemn any more land than that necessary for the expansion alone. Thus, the private use by Hedreen of the condemned land is incidental to the expansion project. Furthermore, in the absence of proof of arbitrary and capricious behavior amounting to constructive fraud, we will not disturb the legislative determination that the north expansion is necessary for the public use. The property owners do not allege that the exhibit hall expansion was used as a pretext to effectuate Hedreen's development. Nor have they shown that the choice of the north alternative based in part on housing dislocation, mechanical requirements and future expansion possibilities was arbitrary and capricious. Therefore, we hold that the State may lawfully exercise the power of eminent domain to acquire the parcels for the Convention Center expansion.
DOLLIVER, SMITH, GUY, JOHNSON, ALEXANDER and TALMADGE, JJ., concur.
SANDERS, J. (dissenting).
The Washington Constitution's prohibition against taking private property for private use is absolute: "Private property shall not be taken for private use...." Const. art. I, § 16 (amend.9). Where the condemned property is to be devoted to both a private and a public use, the constitutional prohibition has no less force:
If a private use is combined with a public use in such a way that the two cannot be separated, the right of eminent domain cannot be invoked.
... [W]here the purpose of a proposed acquisition is to acquire property and devote only a portion of it to truly public uses, the remainder to be rented or sold for private use, the project does not constitute public use.
In re City of Seattle, 96 Wash.2d 616, 627-28, 638 P.2d 549 (1981) (citations omitted).
Therefore, whether one construes these facts to indicate public and private use which cannot be separated, or uses which are wholly separate, the result must be the same: any taking for private use is constitutionally forbidden.
Yet this court's majority rests its conclusion that this seizure of private property for private use passes constitutional muster upon a claimed judicially created exception for "incidental private use." Therefore it is the nature and scope of this claimed exception which we must primarily examine.
To summarize, I would hold: (1) the incidental private use exception is inapplicable because "incidental use" is a private use to effect, aid, or accomplish the same object as the principal use, not simply a wholly distinct private use which may be quantitatively smaller and, most importantly, the exception does not permit any additional condemnation *1260 of private property to serve the private use; (2) any taking in excess of the air space and vertical support necessary for the overhead exhibit hall facility is unconstitutionally in excess to that which is necessarily condemned to permit the public use; and (3) the contemplated recoupment sale whereby condemned private property is sold by the government to a new private owner for profit illustrates, and proves, that this condemnation is not only for private use, but is unconstitutionally in excess of that which is necessary.
Before proceeding to the legal analysis, however, I pause to notice some facts which are particularly germane to the issues presented.

Facts Pertaining to Private Use, Excess Condemnation on Recoupment Sale
After an extended hearing, the Honorable Sharon S. Armstrong, Chief Civil Judge of the King County Superior Court, entered 41 paragraphs of detailed findings to which none of the parties takes serious exception.
At the outset, the learned trial judge recognized the statutory imperative that an expansion to the convention center exhibit hall would not be approved absent a $15 million contribution in public or private funds. See Clerk's Papers (CP) at 41 (Findings of Fact ¶ 15, of Superior Court "Findings of Fact and Conclusions of Law as to Public Use and Necessity," dated June 9, 1997) ("Findings"). Although initial hopes had been entertained that the King County government would front the difference, it soon became apparent that the only possible source of these funds was from private sources and that such funds would not be forthcoming unless property in excess of that which was truly necessary for the convention hall expansion was condemned so as to allow for a private development potential. Thus, the proposed eastward expansion of the convention hall was discarded because it would provide no "surplus" property to induce the $15 million private contribution.
Northward expansion, however, remained a prime candidate since only the air space, about 30 feet from floor to ceiling, would be necessary between four to six stories above the existing surface at a level between elevation 205 and 242 feet. CP at 43 (Findings ¶ 21). Thus the excess space below elevation 205, the "ground parcel," could be used by a private developer, consistent with foundation columns, for retail, hotel, and parking facilities, in conjunction with a privately owned hotel tower rising above a portion of the exhibit hall roof (purchased, not condemned) in the extreme northwest corner of the project. CP at 43 (Findings ¶ 22).
The north alternative was therefore specifically chosen because it provided this opportunity for private use, at government profit, whereas the east alternative was specifically rejected because it "provided no private co-development opportunities that would produce a net financial contribution to the project." CP at 44 (Findings ¶ 26).
The brief of the convention center emphasizes at some length the uniquely separate and private nature of the project below elevation 205, quoting James Ellis, Chairman of the WSCTC Board of Directors, that
[T]he projects themselves are separate. They will be separately owned, separately managed, separately operated and not enter [sic] connected in an operational sense. But they are joined for purposes of construction for economies yielded to both parties.
Report of Proceedings (RP) (May 13, 1997) at 83. The trial court specifically identified this separate private use:
When the structures are complete, the privately developed space will be separately owned and operated from the Convention Center space, and the hotel space will not be interconnected to the Convention Center Space. The Convention Center and private spaces will be physically separate.
CP at 48 (Findings ¶ 38) (emphasis added).
Of particular importance is Finding 37 wherein it is acknowledged that the condemned fee was not only divisible from the public use servitude but specifically would be resold to a private developer:
There will, however, be floors of hotel support facilities and other hotel use in the northwest block and after construction is *1261 completed, the private developer, Hedreen, will receive fee simple title to all surplus property in the northwest block, subject to the Convention Center's ownership of its Exhibit Hall space and easement or fee interest in the supporting columns, stairwells and utility chases, and subject to the terms and restrictions of the Development Agreement preventing the penetration of the Exhibit Hall.
CP at 47-48 (Findings ¶ 37) (emphasis added).
I therefore posit the determinative facts for our review may be summarized as follows:
(1) The condemned property was specifically selected because of the government's intention to resell a portion of the seized space to a private entrepreneur for private use;
(2) The space dedicated to private use will, as part of the same transaction, be deeded in fee to the new private user subject to an easement reserved to the convention center for the overhead exhibition hall and support; and
(3) The private use, except for the financial consideration paid by its private owner, does not in any way, shape, or form contribute, relate to, or enhance the public exhibition hall use.

I.

Private Use
Whether the test is stated as public-use or public-purpose, there is one thing about which American courts have always said that they were adamant. Eminent domain cannot be used to transfer property from one private person to another.[[1]]
A. Absolute Prohibition of State Constitution
The eminent domain provision of the Washington Constitution, Const. art. I, § 16 (amend.9), presents one of the strongest mandates against public taking for private use of any in the nation.[2] Our text expressly prohibits taking property for private use whereas the Fifth Amendment to the United States Constitution only disallows same by inference ("[N]or shall private property be taken for public use...."). History demonstrates these words of article I, section 16, were carefully chosen to strengthen our guarantee over rejected language from other state constitutions (similar to that of the Fifth Amendment), affording our residents enhanced constitutional guarantees against injustice and oppression.[3]
*1262 This absolute and mandatory language is only strengthened, not diminished, by the enumeration of certain, but here inapplicable, exceptions "for private ways of necessity, and for drains, flumes, or ditches on or across the lands of others for agricultural, domestic, or sanitary purposes." The text demonstrates the ratifying public recognized and incorporated these specific exceptions to the otherwise absolute constitutional prohibition as if to say there are no others. Expressio unius est exclusio alterius.[4]
The context of this constitutional provision includes article I, section 29, which states, "The provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise," as well as section 32, which counsels, "A frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government."[5] Such principles must be divined to guide our review if we are to keep the faith of our Fathers.
Moreover within the text of the operative section itself our Framers and Ratifiers expressly rendered the question of public or private use a wholly judicial one ("Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public...." Const. art. I, § 16) (amend.9) to be independently determined without deference to legislative direction or preference. See Healy Lumber Co. v. Morris, 33 Wash. 490, 500, 74 P. 681 (1903) (unlike all but two others, our constitution mandates the court be "untrammeled by any consideration due to legislative assertion or enactment."). See also William B. Stoebuck, A General Theory of Eminent Domain, 47 Wash. L.Rev. 553, 586 (1972) (this clause is responsible for Washington requirement that there be a separate hearing on public use and necessity).
As held in Hogue v. Port of Seattle, 54 Wash.2d 799, 838-39, 341 P.2d 171 (1959), our constitutional prohibition against taking private property for private use is equal in significance to the great constitutional guarantee that just compensation must be paid as a condition precedent to the exercise of the government's power of eminent domain:
[I]t is the duty of the courts to uphold the rights of private property owners against the inroads of public bodies who seek to acquire it for private purposes which they honestly believe to be essential for the public good.
The people of this state have placed in our constitution (Art. I, § 16 (amendment 9)) two restrictions on the power of the state and its municipal subdivisions to acquire private property. Without these two restrictions, the sovereign power to take private property would literally be without limitation. One limitation is that just compensation therefor (as fixed by a jury) must first be paid to the owner, and the second limitation is that a court must determine whether the use for which the property is sought is really a public use. These two restrictions were placed in the constitution for the protection of private property, and each one is equally as important to the property owner as the other. In other words, it is just as important that *1263 the proposed use of the property be limited to what the court decides to be a "really public" use as it is that the property owner be given just compensation.
Id. at 838, 341 P.2d 171. Certainly it is not our role today to diminish, even by a farthing, that liberty which our Forefathers have bequeathed.
B. Incidental Use Doctrine
While the trial court recognized the contemplated private use is obvious and incontrovertible, it nevertheless concluded this condemnation for combined private and public use is constitutionally permissible because "the volumetric ratio of private use to public use is approximately 20 percent to 80 percent." Majority at 1255. Although this calculation is somewhat problematic since the 80 percent product can be achieved only by counting empty air space over a structure which is two-thirds private and one-third public, the principle enunciated by the trial court, that private property may be condemned for private use so long as not more than 50 percent of the total seizure by area or volume is for private use, finds no principled origin in our constitutional text. Rather in consequence the trial court fashioned a rule permitting private property to be constitutionally seized for private use even when the total seizure exceeds that which is publicly necessary by up to 99 percent. That this is the trial court's rule there can be no doubt since the trial court was quite emphatic in her view that without inclusion of the air space in the "public use" calculation, condemnation would constitutionally fail as a public taking for private use.[6]
Notwithstanding, the majority of this court opts for an even more extreme proposition: if any layer of air space is necessary for public use, condemnation of everything from Hades below to the heavens above is fair game for condemnation without concern for the intended private use of nearly everything in-between. Majority at 1258 ("... its footprint spans the entire property to be condemned"). Therefore, from the majority's perspective, the government may condemn a 50-story office building intending only to use one floor for a legitimate public use, selling all of the remaining confiscated private property to the highest private bidder.
While I think it is correct that previous case law indeed stands for the proposition that condemned property "may also be put to a private use that is merely incidental to that public use," Majority at 1255 (emphasis added), before applying this maxim we must necessarily consider the meaning of the term "incidental" as used in those cases, and then test the result against that which the constitutional text forbids. Of course it is ultimately the constitution which we are to protect and expound. Therefore if a branch of judicial precedent should subvert it, which I do not believe this does if properly understood, we had better tear out the tree of precedent by its roots than allow it to infect the remaining orchard with its virulence.
The majority cites Chandler v. City of Seattle, 80 Wash. 154, 141 P. 331 (1914) and City of Tacoma v. Nisqually Power Co., 57 Wash. 420, 107 P. 199 (1910), to support its claim of incidental private use. However the rule I would distill from these cases, and every other incidental private use case,[7] is *1264 that to be "incidental" the private use must usually be in like kind to the public use, or at least dependent upon the public use, and that in no case may more property be condemned to support the public and private use than would necessarily be condemned to permit the public use even if the private use were entirely eliminated.
Chandler concerned the validity of bonds for construction of a steam plant and was, therefore, not an eminent domain case at all. It seems the plant produced electricity in sufficient quantity to supply and satisfy not only the public demand but also yielded a surplus of power during certain hours of minimal public demand. The surplus was therefore available for private use as an "incidental" by-product of the publicly operated facility. This incidental power was an intrinsic and unavoidable consequence of steam plant operation, unlike the situation we have here where the very selection of property to be condemned was structured to provide for a separate and distinct private use, with recoupment sale on top of that. Relying upon Nisqually, by analogy, the rationale advanced in Chandler explains the distinction between an "incidental" use which will support condemnation and a nonincidental use which will not:
If, in the meantime, it permits a small mechanic to run his lathe or sharpen his tools, such a use being so insignificant and so small as compared with the necessities that must be supplied, no court would hold that such use was such a private use as to prevent the city from maintaining these proceedings. A private use incidentally included will not defeat the right to condemn for public use so long as the public use is maintained.
Chandler, 80 Wash. at 159, 141 P. 331 (quoting Nisqually, 57 Wash. at 428, 107 P. 199). Chandler then articulated the "different rule" which applies to other situations:
In that case, the incidental use was smaller than in the case at bar, but the difference is one of degree, not of principle. Where there is a commingling of two objects to the extent that both are principal objects, a different rule applies.
Chandler, 80 Wash. at 159, 141 P. 331. Here a "different rule" does apply because objectively (as well as subjectively) the private parking use is a principal object, although arguably not the only object or even the predominate one. As set forth in Chandler, just because "the incidental use was smaller" is of no account as the true distinction is of principle, not degree. I would thus agree with the thrust of Justice Robert Utter's observation that "incidental" is not a "quantum reference" but rather that which is "incidental to the overarching public purpose." In re City of Seattle, 96 Wash.2d 616, 643-44, 638 P.2d 549 (1981) (Utter, J., dissenting).
Similarly, the private use at issue here is not "incidental" to the convention hall use in the sense that the private use is in any way ancillary to, the product of, or otherwise related to the public use of the exhibit hall facility above it. If we call it "incidental," we call it that only because of its physical proximity to the public use and its alleged relative quantum. But that is a difference in degree, not kind, and such a definition of "incidental" would authorize what our constitution prohibits: condemnation of private property for private use. Moreover, here the "incidental" private use is used to justify condemnation of more property than is truly *1265 necessary for merely the exhibition hall use, a justification which even the majority claims to reject in theory, Majority at 1253 ("the State seeks to condemn no more property than would be necessary to accomplish the purely public component of the project"), but, as will be seen, embraces in practice.

II.

Excess Condemnation
"Excess condemnation is the acquisition by the government through eminent domain of more property than is directly necessary for a public improvement." 2A Julius L. Sackman, Nichols on Eminent Domain § 7.06[7][a] at 7-169 (3d rev. ed. 1998) ("Excess Condemnation").
A. Public Use Doctrine
Our constitution prohibits excess condemnation of more property than is necessary for the proposed public use even if no private use is contemplated. City of Pullman v. Glover, 73 Wash.2d 592, 439 P.2d 975 (1968); Eastvold v. Superior Court, 48 Wash.2d 417, 294 P.2d 418 (1956); 3 Julius L. Sackman, Nichols on Eminent Domain § 9.03, at 9-10 (3d rev. ed. 1998) ("Extent of Interest Acquired, [1]Reasonable Necessity Rule"). This required nexus to necessity is known as the public use doctrine. Stoebuck, Theory of Eminent Domain, supra, at 589. Accordingly, the power of eminent domain is strictly construed against the government, 3 Nichols § 9.03, supra, at 9-17, 9-18, to protect against its abuse.
The majority also acknowledges the rule that "[f]or a proposed condemnation to be lawful, the State must prove that ... property appropriated is necessary for that [public] purpose," Majority at 1255, as well it must. Spokane Valley Land & Water Co. v. Arthur D. Jones & Co., 53 Wash. 37, 48, 101 P. 515 (1909) ("It is fundamental that the condemning party cannot take more than his reasonable necessities require."). See also City of Tacoma v. Humble Oil & Ref. Co., 57 Wash.2d 257, 260, 356 P.2d 586 (1960) (stating "universal rule that the condemner may take no greater interest than is reasonably necessary for the contemplated public use or necessity.") (citations omitted).
B. Necessity is Measured by Narrowest Estate to Permit Public Use
It follows from the reasonable necessity rule (i.e., that the condemnor may take only that estate reasonably necessary to accomplish the purpose for which the property is to be taken) that only an easement or a qualified fee is ordinarily taken, except if the authorizing statute provides that a fee simple shall be taken, or if a fee simple is necessary for the purposes for which the land is taken. Therefore, if the statute is silent regarding the estate to be taken, only an easement may be acquired or, if necessary, a base or qualified fee.[[8]]
3 Nichols § 9.03[3][a], supra, at 9-20, 9-21.
"The estate or interest which is acquired by eminent domain when it is not necessary to condemn the fee is usually called an easement or servitude.... [S]uch an estate or interest exists, and has existed at least as long as private easements have existed." Id. at 9-23.
So too it is clearly the rule in this jurisdiction as well that the "necessity" of the taking must be defined by the narrowest estate in land which will accomplish the public use; whereas condemnation of an easement or other servitude, not a fee, is the norm.
"[I]t is well settled that when land is taken for the public use, unless the fee is necessary for the purposes for which the land is taken, as for example when land is taken for a schoolhouse or the statute expressly provides that the fee shall be taken, the public acquires only an easement."
City of Seattle v. Faussett, 123 Wash. 613, 618, 212 P. 1085 (1923) (quoting 10 R.C.L. 88). See also City of Pullman v. Glover, 73 Wash.2d 592, 595, 439 P.2d 975 (1968) ("In fact, the extent of the taking may be no greater than is reasonably necessary for the stated public purpose."); William B. Stoebuck, 17 Washington Practice, Real Estate: *1266 Property Law § 9.10, at 558 (1995); 3 Nichols § 9.03[3][a], supra, at 9-20.
Just as a railroad may not condemn a right of way in fee, but only as an easement to be extinguished upon abandonment, Neitzel v. Spokane Int'l Ry. Co., 65 Wash. 100, 117 P. 864 (1911), the "necessary" estate to be condemned here is at the fourth-floor level, and arguably above, plus only that space "necessary" for foundation supports. The surplus or excess ground parcelthat which is actually to be sold in fee to the private partyis in no sense "necessary" for this public use, save and except a possible temporary easement for construction purposes. That condemnation of an estate less than a fee would reasonably suffice to accommodate the exhibition hall use is illustrated by the very facts of this case which admit the simultaneous divestiture of the underlying fee, subject to a government servitude coincident with its sale to a new private purchaser.
C. Only Servitude, Not Fee, is Necessarily Taken
A servitude which would allow the construction and placement of the exhibition hall at the fourth floor level is readily capable of independent condemnation in an eminent domain proceeding. See 2 Julius L. Sackman, Nichols on Eminent Domain § 5.04[5][a][i] (3d rev. ed.1998), at 5-298 ("Acquisition of Airspace Development Rights"); Stoebuck, 17 Wash. Prac. § 9.14, supra, at 571 ("Property Rights Upon Land of Another (Servitudes)"); Robert R. Wright, The Law of Airspace (1968); Final Draft of Model Airspace Act, 7 Real Prop., Prob. & Tr. J. 353 (1972) (hereinafter "Model Act"); Pearson v. Matheson, 102 S.C. 377, 86 S.E. 1063 (1915).
The facts of this case present a prototypical example of excess condemnation where the governmental entity seeks to take more property than the proposed project requires. See Stoebuck, 17 Wash. Prac. § 9.14, supra, at 589. Such is obviously true given the proposed public project which by its very nature defines its own "necessities."
What is required is "reasonable" necessity.... The short answer to the question is deceptively simple: if the only justification for an eminent domain taking, the only public use or purpose the governmental entity identifies, is a certain project, then of course any land beyond what the project requires will not be taken for even an alleged public use. If we agree that 20 acres and no more are needed for a public park, then of course one more acre or one more square foot are excess.
Stoebuck, 17 Wash. Prac. § 9.20, supra, at 590.
While the maxim "cujus est solum ejus debet esse usque ad coelum" (whoever has the land possesses all the space upwards to an indefinite extent) is of ancient lineage,[9] early English precedent recognized a separate title in the estate of an upper room or upper stories in houses or buildings. Such was first memorialized in connection with the privileges accorded legal scholars resident at the Inns of Court. See Stuart S. Ball, Division Into Horizontal Strata of the Landspace Above the Surface, 39 Yale L.J. 616, 620 (1930).
The growth of the Temple societies necessitated more chambers and when the societies were unable to finance this building program during the reign of Elizabeth I, the various fellows of the Temples built upon designated sites, with the chamber so erected being granted to them for life with the power in the life tenant of assigning or devising these chambers to any other fellow or fellows who would have a similar life tenancy and power of disposition.
Wright, supra, at 68-69. Accordingly Lord Coke recognized, "[A] man may have an inheritance in an upper chamber, though the lower buildings and soile be in another, and seeing it is an inheritance corporeall it shall passe by livery." Wright, supra, at 69 (citing Coke on Littleton 48b (1628)). See also Model Act at 360.
Such division of property into layers of horizontal estates found favor in American *1267 jurisprudence since the outset, Model Act at 363, where it has been recognized, for example, that "[t]he right of an owner to carve out of his property as many estates or interests (perpendicular or horizontal, perpetual or limited) as it may be able to sustain cannot be open to doubt...." R.M. Cobban Realty Co. v. Donlan, 51 Mont. 58, 149 P. 484, 487 (1915). See also, e.g., Cheape v. Town of Chapel Hill, 320 N.C. 549, 359 S.E.2d 792, 800 (1987) ("[T]hey argue ... the holder of a fee simple may not divide his fee horizontally,... [but] absent some specific restraint, the holder of a fee simple may divide his fee in any manner he or she chooses."); cf. Model Act at 363. Our jurisdiction has also long recognized the validity of an estate in property described by a space in the air. See, e.g., Taft v. Washington Mut. Sav. Bank, 127 Wash. 503, 221 P. 604 (1923) (city may vacate part of street easement suspended at an altitude above the street itself).
D. Air Space May Be Taken in Eminent Domain
Since air space can be transferred, it can be taken in eminent domain. Model Act at 365, 366; cf. Stoebuck, Theory of Eminent Domain, supra, at 606 ("The conclusion is that `property' in eminent domain means every species of interest in land and things of a kind that an owner might transfer to another private person."). See also Model Act at 365; 2 Nichols § 5.04[5][a], supra, at 5-298, and 3 Nichols § 11.02[2], supra, at 11-30. Some eminent domain statutes expressly reference taking air space as well.[10] Moreover an air space estate is even fair game for an action in inverse condemnation. See, e.g., Hillsborough County Aviation Auth. v. Benitez, 200 So.2d 194, 199 (Fla.App.1967).
Applying the aforementioned principles to the case at bar, the conclusion must follow that all that was truly necessary for the government to condemn was a servitude for the air space over the subject property in conjunction with that easement necessary for foundation supports and temporary construction activities. However, the actual condemnation was greatly in excess of that. Such resulted in what the trial court found to be a "surplus" ground estate which the government would resell to a private entrepreneur for recoupment of a portion of its investment. Such our constitution plainly prohibits as well.

III.

Recoupment
Seizure of private property for recoupment sale represents the worst of all possible eminent domain worlds since (1) it delivers condemned property to private use and (2) necessarily represents a seizure of property which is excess to legitimate public use.
A. Recoupment Defined
As found by the trial court, the unnecessary or "surplus" portion of the property to be condemned is, as part of the same transaction, to be resold to a private entrepreneur for his private use subject only to an easement servitude for the aerial estate reserved in the government. In the parlance of eminent domain jurisprudence such is normally referenced as a "recoupment" sale, and universally frowned upon as an unconstitutional condemnation in excess of that which is necessary for public use (except in those situations where peculiar provisions of a state constitution expressly authorize it). "Thus, the basis of recoupment theory is that the government may finance public improvements by condemning more land than is needed and then sell the surplus at a price enhanced by the improvement. The aim here is to recoup the cost of the public project." 2A Nichols § 7.06[7][d], supra, at 7-184.
B. Taking for Recoupment Violates State Constitution
The leading recoupment case is City of Cincinnati v. Vester, 33 F.2d 242, 68 A.L.R. 831 (6th Cir.1929), aff'd, 281 U.S. 439, 50 S.Ct. 360, 74 L.Ed. 950 (1930). Cincinnati there sought to condemn land in addition to *1268 that necessary to widen a street. The City claimed the additional properties condemned were mere remnants, or were alternatively necessary to beautify the improvement. But the court rejected these arguments, finding the excess taking was a recoupment, not a public use, and thus an unconstitutional taking of more private property than that necessary for the public use. See also 2A Nichols § 7.06[7][d], supra, at 7-186. Accord In re Opinion of the Justices, 204 Mass. 607, 91 N.E. 405 (1910) (eminent domain could not be used for development of commercial and industrial center because the motive for excess taking was profit).
So too a New York State Commission report published in 1972 reiterated the nearly universal view that courts have taken a "dim view of control of private property by the government for the sole purpose of making a profit by resale ... [and] not only deem it highly improper but also question the constitutionality of the state using the power of eminent domain to take for a future speculative use." 2A Nichols, § 706[7][d], supra, at 7-186 (quoting Report, New York State Commission on Eminent Domain 46, 47 (1972)). Accord E.L. Strobin, Annotation, Right to Condemn Property in Excess of Needs for a Particular Public Purpose, 6 A.L.R.3d § 6[b] at 311 (In general, American courts have viewed recoupment schemes with disfavor.); Robert H. Freilich & Stephen P. Chinn, Transportation Corridors: Shaping and Financing Urbanization Through Integration of Eminent Domain, Zoning and Growth Management Techniques, 55 UMKC L.Rev. 153, 205 (1987) ("The exercise of excess condemnation solely for recoupment purposes has consistently met with judicial disapproval.").
Only six state constitutions[11] authorize the condemnation of land in excess of that actually needed for public use, and Washington is not one of them.
I therefore submit seizure of private property in our jurisdiction for recoupment sale insults our Declaration of Rights and subverts our enhanced constitutional guarantee against "... great injustice, and often the most serious oppression."[12]

*1269 IV.

Consequences
The majority opinion yields two consequences, one anticipated and one probably not.
The anticipated one is that the absolute state constitutional prohibition against taking private property for private use is judicially repealed. This is necessarily the case because of the majority claim that a public use for one level of floor space, or floor plan, justifies public seizure of everything above it and below it for private use, even recoupment sale.
The second consequence, probably unintended, is that where the government desires to condemn only a horizontal servitude at some elevation so as to restrict the level of public compensation to the private property owner to that which is only "necessarily" acquired (such as a height restriction in an historical district, for example[13]), the private property owner will now be able to claim that the public condemnation, and hence compensation, is inappropriately limited to less than the entire fee estate consistent with the resurrected maxim cujus est solum, ejus est usque ad coelum. I can see no principle inherent in today's opinion, however, which would defeat such an argument because if it is necessary to condemn the entire fee to use but a condominiumized aerial estate because that result is pleasing to the government, there is no reason the same result would not follow simply when it pleases the private land owner.
For these reasons I do dissent, would reverse the order of condemnation because it takes private property for private use and, additionally, seizes private property in excess of that which is necessary for public use.
MADSEN J., concurs.
NOTES
[1] The property owners also suggest that the expansion is dependent upon the Hedreen development to satisfy a zoning ordinance that requires pedestrian oriented frontage at ground level. At this juncture, the significance of the zoning ordinance is unclear. The trial court found that the Hedreen development did fulfill the zoning requirement. However, in the absence of the development, there is no indication from the record whether the City of Seattle would halt the project rather than grant a variance. The city is a participant in the expansion. It has promised the Center $7.5 million for construction and has granted WSCTC a 30-year lease to manage and operate its Freeway Park parking garage.
[2] Pursuant to Laws of 1995, ch. 386 (codified at RCW 67.40.180), WSCTC would have to obtain outside funding from the County or private donations in order to proceed without Hedreen's participation.
[3] Prior to 1927, production of power in order to supply private industry was considered to be a private use. This court ruled that power production was per se a public use in State ex rel. Chelan Elec. Co. v. Superior Court, 142 Wash. 270, 253 P. 115, 58 A.L.R. 779 (1927).
[1] William B. Stoebuck, A General Theory of Eminent Domain, 47 Wash. L.Rev. 553, 595 (1972) (citing VanHorne's Lessee v. Dorrance, 2 U.S. 304, 2 Dall. 304, 1 L.Ed. 391 (1795) and Coster v. Tide Water Co., 18 N.J.Eq. 54 (1866)). "Take that simple case: government pays for and condemns A's land and immediately gives it to B. No one will seriously contend that the transfer was not from A to B, just because the land paused momentarily in the government." Stoebuck, Theory of Eminent Domain, supra, at 598.
[2] § 16 EMINENT DOMAIN. Private property shall not be taken for private use, except for private ways of necessity, and for drains, flumes, or ditches on or across the lands of others for agricultural, domestic, or sanitary purposes. No private property shall be taken or damaged for public or private use without just compensation having been first made, or paid into court for the owner, and no right-of-way shall be appropriated to the use of any corporation other than municipal until full compensation therefor be first made in money, or ascertained and paid into court for the owner, irrespective of any benefit from any improvement proposed by such corporation, which compensation shall be ascertained by a jury, unless a jury be waived, as in other civil cases in courts of record, in the manner prescribed by law. Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public: Provided, That the taking of private property by the state for land reclamation and settlement purposes is hereby declared to be for public use.

Const. art. I, § 16 (amend.9).
[3] W. Lair Hill published a proposed constitution for Washington in The Oregonian on July 4, 1889, which served as the working draft for the delegates to the 1889 Constitutional Convention. Brian Snure, A Frequent Recurrence to Fundamental Principles: Individual Rights, Free Government, and the Washington State Constitution, 67 Wash. L.Rev. 669, 674 n.38 (1992). The notes of the Constitutional Convention contain a tribute to Hill and reflect the tremendous impact of his draft upon the convention delegates. See Lebbeus J. Knapp, The Origin of the Constitution of the State of Washington, 4 Wash. Hist. Q. 227, at 253 (1913). The language of the draft, very similar to that ultimately proposed and ratified, was explained in Hill's commentary:

Most of the constitutions, if not all now in force, prohibit the taking of private property for public use without compensation; but experience has demonstrated that such a general provision is entirely inadequate to prevent great injustice, and often the most serious oppression.
W. Lair Hill, Washington, A Constitution Adapted to the Coming State 8 (1889).
[4] "[T]he expression of one thing is the exclusion of another." Black's Law Dictionary 581 (6th ed.1990).
[5] If the aforementioned were not enough, article I, section 1, administers the coup de grace as that provision provides that "governments ... are established to protect and maintain individual rights"; whereas the power of eminent domain, classically considered government's "despotic power," (Roger Pilon, Can American Asset Forfeiture Law Be Justified?, 39 N.Y.L. Sch. L.Rev. 311, 320 (1994); Stoebuck, Theory of Eminent Domain, supra, at 585-86) was expressly and overtly limited by the text of article I, section 16.
[6] I wish to be clear about one condition for my finding of public use. It is that the air space over all these parcels the petitioner seeks to condemn will not be privately used. If any of the air space is privately used, the private use would completely change the calculus of the use and it would make the private use dominate rather than incidental. This means that the purpose would still be a public one, but the use would be predominately private. If the petitioner condemns the Sansei property, for example, it cannot co-develop the air space with a private party or dedicate it to a private use.

CP at 30 (King County Superior Court Oral Dec. (5/16/97)).
[7] State ex rel. Harlan v. Centralia-Chehalis Elec. Ry. & Power Co., 42 Wash. 632, 634, 85 P. 344 (1906) (electric railway incorporated for both public and private uses may condemn land for purely public ones; however, "where the two are not so combined as to be inseparable, the good may be separated from the bad, and the right [of eminent domain may be] exercised for the uses that are public."); State ex rel. Harris v. Superior Court, 42 Wash. 660, 665-66, 85 P. 666 (1906) (may not condemn land for purpose of generating electricity for both public and private use); State ex rel. Dominick v. Superior Court, 52 Wash. 196, 202, 100 P. 317 (1909) (sale of portion of electric power to third party not sufficient reason to deny power of eminent domain, where power sold will be devoted to public use); State ex rel. Lyle Light, Power & Water Co. v. Superior Court, 70 Wash. 486, 491, 127 P. 104 (1912) (Condemnation statute authorizing sale of excess power is valid only when such power has been generated in good faith for public use but not needed therefore and would otherwise go to waste.); State ex rel. Weyerhaeuser Timber Co. v. Superior Court, 71 Wash. 84, 90, 127 P. 591 (1912) (Land may be condemned for power generation when no power will be used for nonpublic purpose except in such small, insignificant, and incidental amount as to not defeat public character of the use.); State ex rel. York v. Board of Comm'rs, 28 Wash.2d 891, 904, 184 P.2d 577, 172 A.L.R. 1001 (1947) (poles and wires for carrying electricity lining a highway are an excepted incidental use of the highway and abutting property owners have no right to additional compensation); Winkenwerder v. City of Yakima, 52 Wash.2d 617, 328 P.2d 873 (1958) (city ordinance authorizing leasing of advertising space on city parking meters does not offend constitution); Northwest Supermarkets, Inc. v. Crabtree, 54 Wash.2d 181, 186, 338 P.2d 733 (1959) (dedication of a street to public use includes easement sewer rights incidental to the use of the street).
[8] The statute which serves as the basis for this convention hall condemnation does not dictate that a fee estate be condemned. See RCW 67.40.020(2).
[9] The Latin maxim is traced to Accursius of Bologna who lived in the late 12th and early 13th centuries, although it has been suggested that the maxim "entered English law through the usage and influence of the Jews who came to England with the Norman Conquest in 1066." Robert R. Wright, The Law of Airspace 14 n.10, 15 (1968).
[10] See, e.g., RCW 8.25.073 (costs to condemnee for taking "air space corridor"); RCW 47.52.050(2) (government may condemn "air space corridor" above or below highway); RCW 47.12.120 (department may lease air space).
[11] Massachusetts, Missouri, New York, Ohio, Rhode Island, and Wisconsin, and three of these sixMassachusetts, New York, and Rhode Islandrequire that an excess condemnation be specifically approved as such by the legislative body.

Massachusetts Const. pt. 1, art. 10: "The legislature may by special acts for the purpose of laying out, widening or relocating highways or streets authorize the taking in fee by the commonwealth, or by a county, city or town, of more land and property than are needed for the actual construction of such highway or street: provided, however, that the land and property authorized to be taken are specified in the act and are no more in extent than would be sufficient for suitable building lots on both sides of such highway or street, and after so much of the land or property has been appropriated for such highway or street as is needed therefor, may authorize the sale of the remainder for value with or without suitable restrictions."
Missouri Const. art. 1, § 27: "Acquisition of excess property by eminent domain disposition under restrictions.
"That in such manner and under such limitations as may be provided by law, the state, or any county or city may acquire by eminent domain such property, or rights in property, in excess of that actually to be occupied by the public improvement or used in connection therewith, as may be reasonably necessary to effectuate the purposes intended, and may be vested with the fee simple title thereto, or the control of the use thereof, and may sell such excess property with such restrictions as shall be appropriate to preserve the improvements made."
New York Const. art. 18, § 8: The government "may be empowered by the legislature to take property necessary for any such purpose but an excess of that required for public use after such purpose shall have been accomplished."
Ohio Const. art. 18, § 10: The government "may in furtherance of such public use appropriate or acquire an excess over that actually to be occupied by the improvement, and may sell such excess with such restrictions as shall be appropriate to preserve the improvement made."
Rhode Island Const. art. VI, § 19: The government may take in fee, "more land and property than is needed for actual construction in the establishing ... public highways ... [a]fter so much of the land and property has been appropriated for such public highway ... as is needed therefor, the remainder may be held ... or may be sold or leased for value ... and in case of any such sale or lease, the person or persons from whom such remainder was taken shall have the first right to purchase or lease the same...."
Wisconsin Const. art. XI, § 3a: The government "may convey such real estate thus acquired and not necessary for such improvements ... so as to protect such public works and improvements."
[12] See note three, infra.
[13] I assume for the purpose of this example that such is an act of eminent domain rather than an exercise of the police power.