151 P.3d 176 (2007)
PUBLIC UTILITY DISTRICT NO. 2 OF GRANT COUNTY, Washington, a municipal corporation, Respondent,
v.
NORTH AMERICAN FOREIGN TRADE ZONE INDUSTRIES, LLC, a Washington limited liability company, Pacific Northwest Bank, a Washington banking corporation,[] Petitioner.
No. 76755-6.
Supreme Court of Washington, En Banc.
Argued September 29, 2005.
Decided February 1, 2007.
*178 Frank Raymond Siderius, Siderius Lonergan & Martin LLP, Seattle, WA, for Petitioner.
David E. Sonn, Kari D. Kube, Jeffers Danielson Sonn & Aylward PS, Wenatchee, WA, Ray Allen Foianini, Ephrata, WA, for Respondent.
FAIRHURST, J.
¶ 1 North American Foreign Trade Zone Industries, LLC (NAFTZI) seeks reversal of a published Court of Appeals decision holding that Public Utility District No. 2 of Grant County (PUD) satisfied notice requirements for initiation of an eminent domain action and that substantial evidence supported the trial court's determination of public use and necessity for the condemnation. We affirm the appellate court's ruling regarding notice on different grounds. We also affirm the holding that substantial evidence supports the trial court's public use and necessity determination.

I. FACTS
¶ 2 When wholesale prices of energy increased sharply in late 2000 and early 2001, Governor Gary Locke issued proclamations and energy supply alert orders stating that vital public services were at risk and the supply of energy could be disrupted. Citing an energy shortage in the region and concerns about being unable to meet the power needs of its consumers, PUD invoked statutory emergency exemptions under RCW 54.04.070 and RCW 39.04.280 to acquire 20 diesel generators on March 27, 2001 to ensure it could meet demand.
¶ 3 In April 2001, PUD entered into a lease with NAFTZI[1] for 20 acres of unimproved land located adjacent to property PUD owned in Grant County, and PUD placed the generators on the leased property. The lease called for an initial term expiring on July 31, 2002, with a 12 month renewal option.
¶ 4 Throughout the lease negotiation process, and during the term of the lease, correspondence between the parties shows that PUD consistently made clear its desire to acquire the property.[2] PUD was concerned, however, that NAFTZI had overvalued the property, and PUD had yet to obtain permits to operate the generators. Ultimately, a purchase option was not incorporated into the lease contract, and at some point the purchase negotiations broke down.[3]
*179 ¶ 5 One week prior to the regularly scheduled commission[4] meeting in July 2003, PUD's executive secretary prepared and distributed the meeting agenda. Following the procedure she routinely used,[5] the executive secretary faxed the agenda to local newspapers and radio stations, posted the agenda outside the commission's meeting room, sent electronic copies to all PUD employees and individuals who had so requested, and mailed a copy to each of the commissioners.
¶ 6 The meeting agenda referred to Resolution 7643,[6] which was entitled "A Resolution Authorizing the Acquisition By Condemnation of Certain Real Property." Clerk's Papers (CP) at 665. Resolution 7643 identified the property to be condemned and the property owners, including NAFTZI. The resolution stated that PUD had offered the property owners an amount equal to the appraised value and that PUD had been unable to obtain the property through negotiation. It also identified the public use and necessity as "the operating of works, plants, and facilities for generating electric current and furnishing the District and the inhabitants of the District, and any persons including public and private corporations within or without the limit of the District with electric current and energy and to construct facilities for the transmission and distribution thereof." CP at 5. The commission passed the resolution.

II. PROCEDURAL HISTORY
¶ 7 Following the commission's approval of the condemnation action, PUD filed a petition in condemnation in Grant County Superior Court. NAFTZI filed a response, alleging that the proposed taking was not a public use and necessity but did not raise a defective notice argument. Several months later, NAFTZI moved for dismissal alleging for the first time that PUD failed to provide statutory notice under RCW 35.22.288, RCW 35.23.221, RCW 35.27.300, and RCW 35.30.010 of its intent to condemn NAFTZI's property because the notice did not adequately describe the property subject to condemnation.[7] NAFTZI further asserted that such notice was a jurisdictional requirement. Replying to the motion, PUD argued that it was not subject to the statutes referenced by NAFTZI and the statutes that did govern public utilities did not require it to provide the detail cited by NAFTZI.
¶ 8 While the motion to dismiss was pending, PUD placed two alternative resolutions on the agenda for the commission's December 15, 2003, meeting, one ratifying and one repealing Resolution 7643.[8] In addition to *180 the standard notices normally prepared by the executive secretary, PUD also specifically notified NAFTZI's counsel and published the text of the two proposed resolutions, which identified the land at issue, in two local newspapers. The commission approved the resolution ratifying Resolution 7643 and adopted it as Resolution 7680.
¶ 9 The trial court granted NAFTZI's motion to dismiss, finding that the "July resolution did not notify the public of the property or site in question." Verbatim Report of Proceedings (RP) (Jan. 15, 2004) at 28. The court declined to rule on the effects of the resolution passed in December 2003. After PUD filed a motion for reconsideration,[9] the trial court vacated the earlier ruling and ordered the condemnation action to proceed, citing the civil rule for amendment of pleadings and "ratification case law" as the basis.[10] CP at 93.
¶ 10 At the hearing on PUD's motion for determination of public use and necessity, the trial court noted that PUD had performed a cost analysis of the project and recognized the possibility of a need for reserve power capacity. The court also expressed concern that disallowing the condemnation would, in effect, require PUD to incur the cost to remove or sell the generators. Applying the "arbitrary and capricious" standard, the court found a "reasonable basis" for PUD's determination of necessity and ordered the condemnation to proceed to trial. RP (Apr. 1, 2004) at 94-95.
¶ 11 The Court of Appeals, Division Three, affirmed the trial court. Grant County Pub. Util. Dist. No. 2 v. N. Am. Foreign Trade Zone Indus., L.L.C., 125 Wash.App. 622, 634, 105 P.3d 441 (2005). The court concluded that (1) PUD followed statutory requirements in adopting both Resolution 7643 and Resolution 7680, and (2) substantial evidence supported the trial court's determination of public use and necessity. Id. With regard to Resolution 7680, the court concluded that because Resolution 7680 passed before the trial court ruled on the motion to dismiss, there was no purpose to be served by beginning the condemnation process anew. Id. at 631, 105 P.3d 441. It also concluded that any defect in the notice for Resolution 7643 was corrected by the passage of Resolution 7680. Id.
¶ 12 The court also expressly declined to apply an earlier ruling by Division One of the Court of Appeals, Port of Edmonds v. Northwest Fur Breeders Cooperative, Inc., 63 Wash.App. 159, 169, 816 P.2d 1268 (1991), which held that the notice requirements of RCW 35.22.288 applied to condemnations by port districts. The court concluded that the notice requirements of RCW 35.22.288 did not apply to public utility districts because they are subject to a different statutory scheme than port districts. Pub. Util. Dist. No. 2, 125 Wash.App. at 630, 105 P.3d 441.
¶ 13 NAFTZI petitioned for review, which we granted. Pub. Util. Dist. No. 2 of Grant County v. N. Am. Foreign Trade Zone Indus., L.L.C., noted at 154 Wash.2d 1021, 116 P.3d 398 (2005).

III. ISSUES
A. Did PUD fulfill the statutory notice requirements for initiation of an eminent domain action?
B. Did substantial evidence support the trial court's determination of public use and necessity?

IV. ANALYSIS
¶ 14 The power of eminent domain is an inherent attribute of sovereignty. State *181 v. King County, 74 Wash.2d 673, 675, 446 P.2d 193 (1968) (citing Miller v. City of Tacoma, 61 Wash.2d 374, 378 P.2d 464 (1963)). It is limited by the constitution and must be exercised under lawful procedures. Id. Statutes that delegate the State's sovereign power of eminent domain to its political subdivisions, like a municipal corporation, are to be strictly construed. See, e.g., City of Des Moines v. Hemenway, 73 Wash.2d 130, 137, 437 P.2d 171 (1968).
¶ 15 Before the judicial process for condemnation may begin, a city must adopt an ordinance authorizing the condemnation. RCW 8.12.040. A public utility district authorizes a condemnation action pursuant to a resolution of the commission. RCW 54.16.020. Once an entity with the power of eminent domain makes its initial determination to authorize a condemnation action of private property, the matter moves to the superior court for the condemnation, which involves the court determining public use and necessity, fixing the amount of just compensation, and transferring title. In re Petition of Seattle Popular Monorail Auth., 155 Wash.2d 612, 629, 121 P.3d 1166 (2005); see also WASH. CONST. art. I, § 16. This case presents only issues related to PUD's authorization and the public use and necessity stage of the judicial proceeding.
A. Statutory Notice
¶ 16 Procedural errors, such as lack of proper notice, are questions of law reviewed de novo. State v. Harris, 114 Wash.2d 419, 441, 789 P.2d 60 (1990). Although a state entity bears the burden of proving public use and necessity in the judicial condemnation process, the challenger bears the burden of proof that the notice of a public hearing to authorize condemnation was defective.[11] We must decide two questions regarding the notice PUD provided for the meeting held to pass Resolution 7643. First, whether the notice requirements of RCW 35.22.288, RCW 35.23.221, RCW 35.27.300, and RCW 35.30.010, which set out meeting notice requirements for cities and towns related to adoption of ordinances, apply to PUD. Second, whether the notice PUD provided in this case was sufficient. We hold that the statutes do apply and that the notice in this case met the statutory requirements.
1. Applicability of statutes governing notice for adoption of ordinances
¶ 17 We review questions relating to the meaning of a statute de novo. Seattle Popular Monorail Auth., 155 Wash.2d at 627, 121 P.3d 1166. The objective of statutory interpretation is to give effect to the legislature's intent. Id. We consider the statute as a whole and use related statutes to help identify the legislative intent for a particular provision. Id. We consider a statute ambiguous and resort to statutory construction principles only if the statute can reasonably be interpreted in more than one way. Id.
¶ 18 PUD is a municipal corporation established under RCW 54.04.020. As a public utility district, PUD exercises its eminent domain powers "pursuant to resolution of the commission and conducted in the same manner and by the same procedure as is provided for the exercise of that power by cities and towns of the state. . . ."[12] RCW 54.16.020. Chapter 8.12 RCW governs the exercise of eminent domain by cities and towns. It requires a city or town to pass an ordinance before a condemnation action may *182 be commenced, but does not contain any specific requirements related to public notice about hearings held to discuss proposed ordinances. RCW 8.12.040. The notice requirements that cities and towns must follow for hearings informing the public generally of proposed ordinances are set out in RCW 35.22.288, RCW 35.23.221, RCW 35.27.300, and RCW 35.30.010.
¶ 19 NAFTZI argues that PUD is required to conform to the notice provisions of RCW 35.22.288, RCW 35.23.221, RCW 35.27.300, and RCW 35.30.010 in accordance with the holding in Northwest Fur Breeders. PUD argues that Northwest Fur Breeders does not apply to public utility districts because the two entities are subject to different statutory schemes. Instead, PUD claims it is subject only to the provisions of chapter 54.16 RCW (powers of public utility districts), chapter 42.30 RCW (Open Public Meetings Act of 1971), and chapter 8.12 RCW (eminent domain by cities).
¶ 20 The Northwest Fur Breeders court concluded that the notice requirements governing adoption of ordinances by first class cities apply to a port district seeking to condemn property because the port district is statutorily required to exercise eminent domain powers in the same manner as first class cities. 63 Wash.App. at 165, 816 P.2d 1268. The court also concluded that RCW 35.22.288 acts to modify chapter 8.12 RCW by specifying the procedure for the adoption of ordinances by first class cities. Id. In declining to apply Northwest Fur Breeders, Division Three said only that port districts and public utility districts are subject to "different statutory scheme[s]." Pub. Util. Dist. No. 2, 125 Wash.App. at 630, 105 P.3d 441.
¶ 21 However, the statute governing PUD's exercise of eminent domain is almost identical to the statute governing the exercise of eminent domain by port districts, except that one refers to the procedures used by cities and towns and the other refers to procedures of first class cities.[13] RCW 54.16.020. Because the notice requirements are the same for all classes of cities and towns, the two schemes are virtually indistinguishable.[14]
¶ 22 We conclude that the Court of Appeals erred in concluding that the statutory schemes for condemnation differ for port districts and public utility districts because the procedures used by cities and towns are the same as the procedures used for cities of the first class. We hold that the notice requirements of RCW 35.22.288, RCW 35.23.221, RCW 35.27.300, and RCW 35.30.010 apply to public utility districts regarding the exercise of eminent domain powers.
2. Sufficiency of notice
¶ 23 NAFTZI also contends that PUD did not provide adequate notice for Resolution 7643 because the preliminary agenda failed to identify the specific property that PUD sought to condemn and the property owner. PUD argues that the notice it provided is distinguishable from the notice provided in Northwest Fur Breeders because here the condemnation issue was expressly stated in the agenda. PUD also contends that the agenda was sufficient because it referred to the resolution and the resolution identified the property and the property owners.
¶ 24 We agree with PUD that the notice in this case is distinguishable from *183 the notice provided by the port district in Northwest Fur Breeders. Whereas the port district failed to make any mention of condemnation, PUD specifically referred to condemnation of certain real property and to Resolution 7643. Two of the dissenting opinions erroneously persist in arguing that the notice for the meeting to discuss Resolution 7643 was deficient because it failed to identify the property owner and the property to be condemned. Dissent (J.M. Johnson, J.) at 198; dissent (Chambers, J.) at 194, 195. However, it is important to remember that at this stage of the process, notice is to the public. As we have noted previously, although a specific description of the property is required for the public use and necessity hearing, notice of a public hearing to authorize condemnation need be only "descriptive enough for a reasonable person to be fairly apprised of what was to be discussed at the meeting" and is generally deemed adequate absent a showing that it was misleading. Cent. Puget Sound Reg'l Transit Auth. v. Miller, 156 Wash.2d 403, 416, 128 P.3d 588 (2006) (emphasis added) (citing Dep't of Natural Res. v. Marr, 54 Wash.App. 589, 596, 774 P.2d 1260 (1989) (citing Nisqually Delta Ass'n v. City of DuPont, 103 Wash.2d 720, 727, 696 P.2d 1222 (1985))).
¶ 25 In any event, PUD's agenda referred to the resolution, and the resolution identified both the property and the property owners. The resolution also stated that PUD sought to condemn the property "for use as a diesel generation site." CP at 666 (emphasis added). Thus, the notice here, as in Miller, was not only sufficient to put the public on notice that a resolution authorizing acquisition for condemnation would be considered at the meeting, it exceeded the statutory requirements. Nothing more was required at this stage of the process and the corrective action PUD took afterward to ratify Resolution 7643 was unnecessary. If NAFTZI believes the statute should require more specific notice, it should pursue the issue with the state legislature. We will not read requirements into a statute that are not there.
¶ 26 Additionally, two of the dissenting opinions misstate the law and the facts when they claim that due process entitles the landowner to notice of the agenda of a public meeting to authorize a condemnation. Dissent (J.M. Johnson, J.) at 196, 197, 198 n. 5; dissent (Alexander, C.J.) at 191-92. The fourteenth amendment to the United States Constitution guarantees due process to individuals and the notice at issue here is to the public, not the individual landowner. Notice for a public meeting to discuss a resolution authorizing condemnation is no different from notice for any other resolution. A resolution does not result in a taking of property and does not deprive a property owner of any rights.[15] Even if the resolution is approved, the condemnation action may or may not go forward. The actual condemnation action does not occur until the judicial hearing. Hyperbole and inflated rhetoric do not alter the fact that the individual landowner's constitutional rights are protected in the judicial proceeding, not in the public meeting authorizing condemnation.
¶ 27 Moreover, none of the cases Chief Justice Alexander or Justice J.M. Johnson cite support their contention that constitutional due process notice rights are at issue here. Chief Justice Alexander cites only to cases involving notice for judicial condemnation or comparable proceedings, none of which suggests that their holdings have broader application to a public meeting to discuss authorizing a condemnation.[16] Justice *184 J.M. Johnson cites only his or other dissenting opinions.[17]
¶ 28 Justice Chambers also asserts that the notice PUD provided for the meeting on Resolution 7643 did not adequately allow for public comment on the proposed condemnation. Dissent (Chambers, J.) at 194-95. We disagree. We have clearly established that the commission discussed the proposed condemnation in a regular meeting open to the general public after notifying the public of the meeting agenda.
¶ 29 We therefore affirm the Court of Appeals on different grounds. Unlike the Court of Appeals, we hold that PUD is subject to the notice requirements of RCW 35.22.288, RCW 35.23.221, RCW 35.27.300, and RCW 35.30.010 for meetings held to adopt resolutions authorizing acquisition for condemnation. We also hold the notice provided for Resolution 7643 met the statutory requirements. Because we hold that the notice for Resolution 7643 was sufficient, we do not decide the effect of Resolution 7680.[18]
B. Public Use and Necessity
¶ 30 Once a government entity passes a resolution or ordinance, as appropriate to that entity, authorizing a condemnation action, it must file a petition in superior court requesting a decree of public use and necessity. RCW 8.12.050. The petition must include a copy of the resolution or ordinance and contain a "reasonably accurate description" of the property to be condemned. RCW 8.12.060.
¶ 31 A decree of public use and necessity may be entered for a proposed acquisition only when the use in question is really a public use, public interests require it, and the property to be acquired is necessary to facilitate the public use. Hemenway, 73 Wash.2d at 138, 437 P.2d 171.
*185 1. Public use
¶ 32 The question of whether the use is really a public use is a judicial determination. Seattle Popular Monorail, 155 Wash.2d at 629, 121 P.3d 1166; WASH. CONST. art. I, § 16.[19] Washington courts have repeatedly held that condemnation of private property by public utilities to generate electric power is a public use. Dickgieser v. State, 153 Wash.2d 530, 537, 105 P.3d 26 (2005); State ex rel. Wash. State Convention & Trade Ctr. v. Evans, 136 Wash.2d 811, 821, 966 P.2d 1252 (1998); Pub. Util. Dist. No. 1 of Chelan County v. Wash. Water Power Co., 43 Wash.2d 639, 643, 262 P.2d 976 (1953); State ex rel. Chelan Elec. Co. v. Superior Court, 142 Wash. 270, 272, 253 P. 115 (1927). In addition, we have expressly held that a finding of public use is not defeated where alleged private use is incidental to the public use. Evans, 136 Wash.2d at 822, 966 P.2d 1252; City of Tacoma v. Nisqually Power Co., 57 Wash. 420, 428, 107 P. 199 (1910).
¶ 33 NAFTZI's primary contention is that the use is private because PUD only condemned the property to avoid the economic burden of removing the generators and to increase revenues by capitalizing on price fluctuations in the energy market. PUD has consistently argued that its primary purpose in installing the generators and condemning the property was to provide energy to its customers. At the public use and necessity hearing, PUD presented extensive evidence that the generators were installed to act as a hedge against future market increases and that the generators would enable PUD to satisfy the energy needs of its customers.[20] The mere fact that PUD would be able to increase revenues by installing the generators did not convert the use into a private one.[21]
¶ 34 In addition, PUD's plans to sell excess electric power generated did not render the income from those sales private, even if it was sold on an energy market to noncustomers. Wash. Water Power, 43 Wash.2d at 642, 262 P.2d 976 (affirming that Chelan County Public Utility District's sale of electric power to "`public and private corporations, within or without its limits'" was a public use even though the condemnation allowed the district to acquire excess capacity) (quoting Chelan County Superior Court Decree of Public Use and Necessity); see also State ex rel. Chelan Elec. Co. v. Superior Court, 142 Wash. 270, 272, 253 P. 115 (1927) (concluding that all uses of electric power are "public" uses, irrespective of the user). It is immaterial whether PUD earns revenue by selling electric power directly to its customers or indirectly on an energy market. Because PUD is a public utility, any increase in PUD's revenue is still public revenue. If a public utility uses private property it obtained through condemnation to generate revenue, places the revenue into an account within its control, and uses the revenue for public purposes, the purpose of the property remains public, not private. Dickgieser, 153 Wash.2d at 537-38, 105 P.3d 26.
¶ 35 We conclude that the condemnation was for a public use.
2. Necessity
¶ 36 A determination of necessity is a legislative question. Seattle Popular *186 Monorail, 155 Wash.2d at 629, 121 P.3d 1166; Miller, 156 Wash.2d at 411, 128 P.3d 588. A declaration of necessity by a legislative body is "conclusive in the absence of proof of actual fraud or arbitrary and capricious conduct, as would constitute constructive fraud."[22]Seattle Popular Monorail, 155 Wash.2d at 629, 121 P.3d 1166. A condemnation of private property is necessary if it is "`reasonabl[y] necessary'" under the circumstances. Id. at 636 n. 19, 121 P.3d 1166. Challenges to necessity are generally raised when excess land is condemned or when the condemnation is actually for a private use. Evans, 136 Wash.2d 811, 966 P.2d 1252 (holding condemnation of property needed for convention center lawful even though an incidental private use would ensue).
¶ 37 Courts do not disturb a determination of necessity if it was reached "honestly, fairly, and upon due consideration" of the facts and circumstances. City of Tacoma v. Welcker, 65 Wash.2d 677, 684, 399 P.2d 330 (1965). Even where the decision was motivated in part by improper considerations, a reviewing court will not vacate if "`the proposed condemnation demonstrates a genuine need and . . . the condemnor in fact intends to use the property for the avowed purpose.'" Miller, 156 Wash.2d at 418, 128 P.3d 588 (alteration in original) (quoting In re Petition of Port of Grays Harbor, 30 Wash.App. 855, 864, 638 P.2d 633 (1982)).
¶ 38 Because the trial judge already weighed the evidence supporting PUD's determination of necessity, we review the record only to determine whether the court's factual findings are supported by substantial evidence. We view substantial evidence in the light most favorable to the respondent. State v. Hill, 123 Wash.2d 641, 644, 870 P.2d 313 (1994).
¶ 39 NAFTZI argues that PUD failed to demonstrate necessity because it did not prove a shortage of energy in the area. NAFTZI also contends that the evidence presented at the condemnation hearing demonstrated that PUD's sole purpose in acquiring the generators was to sell the generated power at inflated prices. PUD disputes NAFTZI's characterization of its purpose. PUD first cites Governor Locke's proclamations and energy supply alert orders as evidence of an emergency. PUD also points to Resolution 7643, which stated that the purpose of the condemnation was operation of a facility to generate electrical current and furnish it to PUD's customers. In addition, PUD produced evidence at the condemnation hearing of fluctuations in the demand for electric power, the tentative nature of its forecasts regarding hydroelectric power, and the backup role the diesel facility serves in cases of power interruption from other sources.
¶ 40 As NAFTZI asserts, the record suggests that PUD's decision to install the generators was motivated, at least in part, to maximize profits from energy sales.[23] However, *187 the record also contains ample evidence that the generators were purchased in response to a real energy crisis and that PUD was acting primarily to protect its ability to provide energy to its customers. Moreover, NAFTZI failed to present any evidence of actual fraud or arbitrary and capricious conduct amounting to constructive fraud by PUD. Absent proof of fraud or arbitrary and capricious conduct, we view PUD's declaration of necessity as conclusive. Accordingly, we affirm the Court of Appeals.

V. CONCLUSION
¶ 41 We hold that PUD is subject to the notice requirements for enactment of ordinances by cities and towns and the notice here met the statutory requirement. We also hold that the trial court did not abuse its discretion in finding that substantial evidence supported a determination of public use and necessity. We affirm the Court of Appeals.
WE CONCUR: CHARLES W. JOHNSON, SUSAN OWENS, BARBARA A. MADSEN, and BOBBE J. BRIDGE, JJ.
MADSEN, J. (concurring).
¶ 42 I agree wholeheartedly with the majority's well-reasoned opinion. I write separately to emphasize that under Washington statutes, our legislature currently provides property owners with protections beyond those required by either the state or federal constitutions. For example, public property owners receive notice of the preliminary legislative hearings held to determine whether to proceed with a condemnation. Additionally, they receive a personal notice and a hearing on use and necessity. Further, property owners in this state receive personal notice and a trial on just compensation. Beyond the notices provided by statute, in this case there were numerous additional, voluntary protections provided by Public Utility District No. 2 of Grant County (PUD), resulting in the property owner here, North American Foreign Trade Zone Industries, LLC (NAFTZI), receiving protections far beyond those required by the constitution.
¶ 43 As to the first hearing on the resolution to acquire the property at issue here, a copy of the agenda was posted outside the commission's meeting room, mailed to local newspapers and radio stations, and mailed to those requesting a copy. The agenda referenced the resolution by number and indicated the nature of the resolution. The resolution was made available upon inquiry. As to the second public hearing, the text of the resolution was published in full in newspapers and NAFTZI or its attorney received personal notice of a public hearing and had the opportunity to be heard. Indeed, NAFTZI participated in the legislative hearing.
¶ 44 I am troubled by the tenor of the dissenting opinions, which misconstrue the facts and the relevant law pertaining to the rights afforded in a condemnation proceeding. Moreover, the dissenting opinions blatantly rely on inapplicable case law and fail to address, in any meaningful way, the historical and legal context of eminent domain proceedings. In particular, I am concerned by Chief Justice Alexander's and Justice J.M. Johnson's dissenting opinions in which they, without any authority, attempt to erroneously "constitutionalize" aspects of eminent domain proceedings. It is the duty of this court to uphold and enforce the constitution, not to legislate from the bench.

DISCUSSION
¶ 45 As the majority points out, the main dispute between NAFTZI and PUD is over the compensation owed to NAFTZI for its property used to house 20 of PUD's diesel generators. Prior to PUD's initiation of the condemnation proceeding, the parties could not agree over the fair market value of the property. The Washington Constitution provides that private property shall not be taken for public or private use "without just compensation," which "compensation shall be ascertained by a jury, unless a jury be waived." Const. art. I, § 16. Here, the parties are *188 involved in the first stage of the judicial proceedings, the determination of public use and necessity of the property, which will then be followed by a trial on compensation. The issue here involves the nature and extent of advance public notice required before a legislative determination of condemnation is made. There is no debate that NAFTZI received full, personal notice of the condemnation action following the legislative decision to go forward with condemnation proceedings.
¶ 46 Chief Justice Alexander admits, as he must, that PUD complied with the statutory requirements; however, he erroneously argues the notice was somehow constitutionally deficient. Justice Chambers conceded no constitutional claim exists in this case, yet he concludes the notice given for Resolution 7643 was somehow deficient and the adoption of Resolution 7680 in December 2003 for unexplained reasons did nothing to cure this deficiency. In any event, the condemnation action against NAFTZI did not commence until after the adoption of at least one, if not two, valid resolutions. The dissenting opinions ignore the fact that NAFTZI received a fair condemnation hearing following a validly adopted resolution and instead confuses the issue before us by constitutionalizing a statutory requirement and creating a debate where none should exist.
¶ 47 Initially, I agree with Chief Justice Alexander's dissenting opinion explaining that the general intent of notice statutes is to inform the affected public of the purpose of a public meeting so that they may adequately (and intelligently) prepare for the meeting. Barrie v. Kitsap County, 84 Wash.2d 579, 584-85, 527 P.2d 1377 (1974) (citing Glaspey & Sons, Inc. v. Conrad, 83 Wash.2d 707, 711-12, 521 P.2d 1173 (1974)). In both of those cases, this court found the notice defective because each misled the public and did not inform the public of the "purpose" of the public meeting as required by the relevant statute. In Barrie, the notice misled the public because it indicated to the reader of the notice that a proposed rezone of property was for the exclusive purpose of a proposed planned unit development as a shopping and professional center, instead of indicating that the rezone could apply to other development, different from the proposed planned unit development. Barrie, 84 Wash.2d at 584-85, 527 P.2d 1377. In Glaspey & Sons, the notice misled the public because the notice did not explain that the proposed zoning ordinance that was the subject of discussion at the meeting had been significantly amended prior to the meeting and such amendments were not available to the public in the commissioner's office prior to the meeting.
¶ 48 I also agree with Chief Justice Alexander's dissenting opinion that PUD clearly met the statutory notice requirements. See, e.g., RCW 35.22.288 (providing that a city must provide notice of a hearing and the preliminary agenda to the public). As the majority explains, prior to its July 2003 meeting, PUD, among other actions, faxed the agenda to local newspapers and radio stations and posted the agenda outside the commissioner's meeting room. The meeting agenda referred to Resolution 7643, entitled "A Resolution Authorizing the Acquisition By Condemnation of Certain Real Property." Resolution 7643 identified the property to be condemned and the property owners and provided that PUD had offered the property owners compensation equal to the appraised value but that PUD was unable to obtain the property through negotiation. The resolution also explained that the property was to be used for operating of works, plants, and facilities for generating current and furnishing inhabitants of the district and others with electric current and energy.[1] Thus, PUD clearly notified and informed the public as to the preliminary agenda, the purpose of the meeting, which involved condemnation of *189 property as required by statute, and did not mislead.
¶ 49 I part company with Chief Justice Alexander's dissenting opinion, though, when it asserts that such notice, which clearly met the statutory requirements provided by the legislature, did not satisfy the due process clause of the fourteenth amendment to the United States Constitution. Dissent (Alexander, C.J.) at 191, 192. The assertion is mistaken.
¶ 50 It is well-settled that in condemnation proceedings, the constitution does not require personal notice to the property owner at this preliminary stage. Port of Edmonds v. Nw. Fur Breeders Coop., Inc., 63 Wash. App. 159, 168-69, 816 P.2d 1268 (1991) (the due process clause does not require personal notice before the judicial hearing stage in condemnation cases); King County v. Olson, 7 Wash.App. 614, 618, 501 P.2d 188 (1972). Accord Joiner v. City of Dallas, 380 F.Supp. 754, 764-65, 769 (N.D.1974) ("[t]he perimeters of the Due Process requirement in eminent domain proceedings have been sharply defined," "well-settled body of case law" provides that due process does not require notice and hearing to the property owner regarding legislative stage of preceding; due process does require notice and hearing to property owner regarding compensation), aff'd, 419 U.S. 1132, 95 S.Ct. 818, 42 L.Ed.2d 831 (1975); Joslin Mfg. Co. v. City of Providence, 262 U.S. 668, 677, 43 S.Ct. 684, 67 L.Ed. 1167 (1923); Bragg v. Weaver, 251 U.S. 57, 58, 40 S.Ct. 62, 64 L.Ed. 135 (1919); Tenn. Gas Pipeline Co. v. 104 Acres of Land, 749 F.Supp. 427, 430-31 (D.R.I.1990) (following "long line of decisions" holding that personal notice to property owner in agency proceedings is not required under due process, it is "beyond doubt" that argument lacks merit); Bailey v. Anderson, 326 U.S. 203, 204-05, 66 S.Ct. 66, 90 L.Ed. 3 (1945) (due process requires notice and opportunity to be heard regarding compensation in the course of the condemnation proceedings and to offer evidence as to the value of the land). Together these decisions instruct us that because the condemning authority's decision regarding the need for taking and the property to be taken is fundamentally legislative, landowners have no right to participate in that decision or to litigate the decision to condemn on constitutional grounds.
¶ 51 Chief Justice Alexander's dissent fails to acknowledge or distinguish this body of case law. Moreover, the cases cited by his dissenting opinion do not compel a different result. Although his dissent cites Schroeder v. City of New York, 371 U.S. 208, 212, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962) and Walker v. City of Hutchinson, 352 U.S. 112, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956), two cases involving condemnation for support, it fails to explain their holdings. His dissent fails to point out that both cases stand for the long-standing proposition that notice and a hearing is required to property owners regarding compensation in condemnation cases. In Walker, a municipal corporation (city) initiated condemnation proceedings to widen city streets. A property owner affected by the condemnation was not given personal notice of the judicial condemnation proceedings in which compensation was determined for the property owner. The Court found that notice by publication was insufficient under due process because in cases of eminent domain, due process requires that a property owner whose property is appropriated for a public use be given notice and a hearing to "determin[e] just compensation." Walker, 352 U.S. at 115, 77 S.Ct. 200.
¶ 52 Similarly, in Schroeder, 371 U.S. at 209-10, 83 S.Ct. 279 a property owner was not provided personal notice as to the condemnation proceedings or the right to make a claim for damages, which expired after three years if a property owner did not bring a claim. Accordingly, the Court found that notice by publication violated due process due to the lack of notice and opportunity for a hearing on damages. Id. at 211, 83 S.Ct. 279. In this case, contrary to Walker and Schroeder, the only cases in the eminent domain context cited by Chief Justice Alexander's dissenting opinion, NAFTZI received and will receive personal notice of all aspects of the judicial condemnation proceeding, including the trial court's determination of the public use and necessity of the appropriation of NAFTZI's property and the future trial on compensation.
*190 ¶ 53 I am also troubled by Chief Justice Alexander's reliance on Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), equating condemnation proceedings with seizures of property. See dissent (Alexander, C.J.). As the majority opinion correctly makes clear, the power of eminent domain is an "inherent attribute of sovereignty." Majority at 180. This inherent attribute is of ancient origin. See, e.g., Roscoe Pound, The Valuation of Property in the Roman Law, 34 Harv. L.Rev. 227 (1920-21) (appropriation of property for public purposes, such as schools, roads, etc., dates back to the Roman Empire, around 450 B.C.); 1 Julius L. Sackman & Russell D. VanBrunt, Nichols on Eminent Domain § 1.12 (3d ed.2006) (the power of sovereignty to appropriate property for public use has been exercised since the Romans). As Henry E. Mills and Augustus L. Abbott stated in their treatise on eminent domain in 1888:
Eminent domain, or the power of the sovereign to condemn private property for public use, has been recognized and treated of by jurists for centuries. The commentators on the civil law treat it as an established power of long standing. Puffendorf calls it the "exercise of transcendental propriety;" as if the sovereign thereby resumed possession of that which had been previously granted to the subject upon the condition that it might be again resumed to meet the necessities of the sovereign. . . . In the United States this right of the subject is secured by the Federal Constitution, and by a separate clause in the bill of rights of almost every state in the Union. In the absence of provisions in the constitutions, the courts have considered that the principle was so universal and fundamental that laws not recognizing the right of the subject to compensation would be void. The constitutions of the states do not confer upon the legislatures the power of eminent domain, but they recognize its existence and attached conditions upon the exercise of the power. It is an incident of sovereignty and requires no constitutional recognition. The right existed prior to constitutions. It is inherent in the state and belongs to every independent government. It is in the nature of a compulsory purchase of the property of a citizen for the purpose of applying it to public use.
Henry E. Mills & Augustus L. Abbott, Mills on the Law of Eminent Domain 81-82 (2d ed. 1888) (footnotes omitted).
¶ 54 Because the state has inherent power of eminent domain, the eminent domain clause of the Washington Constitution article I, section 16 does not contain an express grant of eminent domain power. Rather, it contains limitations upon the exercise of the power, such as the compensation requirement, along with several provisions that govern procedure, such as the requirement that the amount of compensation be determined by a jury. 17 William B. Stoebuck & John W. Weaver, Washington Practice: Real Estate: Property Law § 9.3, at 566 (2004).
¶ 55 Although a seizure or forfeiture may flow from the State's police power, a seizure is not justified under the eminent domain power and does not involve a right to just compensation. Moreover, unlike a decision to condemn property, a government seizure does not involve a legislative determination at a public hearing. In the context of a seizure, due process requires individual notice precisely because the seizure occurs without any public notice and often without a preliminary hearing.
¶ 56 In contrast, in this case the notice to the public was in compliance with the statutes relating to notice and NAFTZI received actual notice of the reasonable necessity hearing and the compensation trial. Given the notice to NAFTZI and its full participation in the public hearing process, there is simply no due process violation in this case.
¶ 57 Of course, if the legislature wishes to provide even greater statutory notice of the public process in condemnation proceedings, it is clearly free to do so.
WE CONCUR: CHARLES W. JOHNSON, SUSAN OWENS, and MARY E. FAIRHURST, JJ.
*191 ALEXANDER, C.J. (dissenting).
¶ 58 Once again we are called upon to decide whether a public agency provided adequate notice before making a decision to condemn private property. As I did in the fairly recent case of Central Puget Sound Regional Transit Authority v. Miller, 156 Wash.2d 403, 128 P.3d 588 (2006), I write separately to emphasize that agencies subject to a notice statute must carry out not only the letter but the intent of the statute's notification requirements. We have said that the purpose of notice statutes is to fairly and sufficiently inform those who may be affected by government action of the nature and character of a proposed action "so they may intelligently prepare for the [public] hearing [on the action]." Nisqually Delta Ass'n v. City of DuPont, 103 Wash.2d 720, 727, 696 P.2d 1222 (1985) (citing Barrie v. Kitsap County, 84 Wash.2d 579, 585, 527 P.2d 1377 (1974)). Because I believe that Public Utility District No. 2 of Grant County (PUD) failed to "fairly and sufficiently inform" the petitioner of a critical step toward condemning the petitioner's propertyand that this failure violated the due process clause of the fourteenth amendment to the United States ConstitutionI dissent.
¶ 59 I share the concerns that Justices Chambers and J.M. Johnson have expressed about the lack of specific information in the meeting agenda that served as the sole notice that a condemnation resolution was being considered by the PUD. As the United States Supreme Court said in another property condemnation case, Schroeder v. City of New York, 371 U.S. 208, 212, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962), the chance of actual notice to an affected owner is reduced when " `the notice required does not even name those whose attention it is supposed to attract, and does not inform acquaintances who might call it to attention.'" (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 315, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). The failure to describe the property or its owner is particularly troublesome here, where the PUD had previously negotiated with the property owners, albeit unsuccessfully, to buy the property before deciding to condemn it. That being the case, it is reasonable to conclude that the district faced no difficulty in identifying or locating the owner.
¶ 60 But neither the dissenters nor the majority in this case address the due process issues raised by the petitioner, North American Foreign Trade Zone Industries (NAFTZI), and by amicus Institute for Justice.[1] As we have said in the past, "There is a distinction which must be drawn between statutory notice and notice required by due process." City of Tukwila v. King County, 78 Wash.2d 34, 38, 469 P.2d 878 (1970). That the PUD may have met the requirements of one does not ensure that it has done so for both: "The United States Supreme Court has held that in some circumstances the notice by publication, required by statute, may be inadequate to meet the requirements of constitutional notice." Id. (citing Mullane, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865).
¶ 61 As the majority correctly observes, greater notice is required for the judicial condemnation proceedings that must take place before an owner is finally deprived of the property to be condemned. See majority at 182. However, the fact that a subsequent judicial proceeding takes placein which actual notice is given to the affected property ownerdoes not cure all ills associated with the initial process of authorizing the condemnation. Thus, although I agree with the majority that the public utility district complied with the minimal requirements of the notice statute by sending its meeting agenda *192 to local newspapers and radio stations and by posting the agenda outside its meeting room, I disagree that our inquiry should end there.
¶ 62 The due process clause requires notice "reasonably calculated to inform parties of proceedings which may directly and adversely affect their legally protected interests." Walker v. City of Hutchinson, 352 U.S. 112, 115, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956) (emphasis added). Here, when the PUD adopted a resolution finding a "public necessity" to condemn the petitioner's property, that proceeding "directly and adversely" affected the petitioner's interest in the property. That is because the utility district cannot take the petitioner's land unless it proves both a public use for the land and a public necessity to condemn it. See In re Petition of Seattle Popular Monorail Auth., 155 Wash.2d 612, 629, 121 P.3d 1166 (2005). I agree with Justice Chambers that the district's resolution "will likely be deemed conclusive with respect to the issue of public necessity." Dissent (Chambers, J.) at 195. As we said recently, "A declaration of necessity by a proper municipal authority is conclusive in the absence of actual fraud or arbitrary and capricious conduct, as would constitute constructive fraud." Seattle Popular Monorail Auth., 155 Wash.2d at 629, 121 P.3d 1166. Thus, the PUD made what was likely a final and conclusive determination that it was necessary to take the petitioner's property. Therefore, I believe this court should carefully scrutinize whether the notice given to the petitioner comports with the requirements of due process.[2]
¶ 63 Whether the PUD's notice was consistent with the requirements of due process is determined by Mullane's balancing approach. In Mullane, the Supreme Court held that state action affecting property must generally be accompanied by notification of that action. It said, "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane, 339 U.S. at 314, 70 S.Ct. 652. In the years since Mullane was decided, the United States Supreme Court has adhered to the principles it established there by balancing the "interest of the State" and "the individual interest sought to be protected by the Fourteenth Amendment." Id. Consistent with that notion, it has said that courts should focus on the "reasonableness of the balance, and, as Mullane itself made clear, whether a particular method of notice is reasonable depends on the particular circumstances." Tulsa Prof'l Collection Servs., Inc. v. Pope, 485 U.S. 478, 484, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988).
¶ 64 This balancing test has been used in multiple settings to evaluate the propriety of notice. Although, as noted above, it was first put forward in Mullane when the Supreme Court reviewed the adequacy of notice through publication in the context of administering a trust, later cases have employed it to evaluate the propriety of notice in broader contexts. See, e.g., Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 799, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983) (reviewing the propriety of publication for a probate proceeding); see also Tulsa Prof'l Collection Servs., 485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565. These cases show, at a minimum, the propriety of notice for purposes of due process is evaluated by a balancing test. That balancing test is appropriate here, regardless of the fact that we are focusing on *193 the early stages of condemnation proceedings.
¶ 65 Looking at this case, I am satisfied that a balancing of interests leads to a conclusion that the PUD did not provide notice consistent with the requirements of due process. The initial notice given by the PUD can be described only as minimal. Significantly, the notice was not sent directly to the affected property owners. Instead, the notice, which was merely a meeting agenda indicating that condemnation of real property would be considered, was posted, "transmitted to the media," and "transmitted . . . to every person and entity that requested it." Br. of Resp't at 5 (citing Clerk's Papers (CP) at 662-65).
¶ 66 Although notifying local newspapers and radio stations a week before the vote on the resolution may have satisfied the notice statute, I am not convinced it did much more, and certainly did little to protect the property owners' right to due process. The agenda simply indicated as follows: "7643A Resolution Authorizing the Acquisition By Condemnation of Certain Real Property." CP at 665. To say the least, this was scant notice that condemnation proceedings might be initiated. Furthermore, it was buried in the middle of an agenda for a routine PUD commission meeting, between items such as the time for lunch and a motion to authorize negotiation with a local business. Furthermore, there is no evidence that the notice was actually published in a newspaper or broadcast by any radio station.
¶ 67 In sum, I am not persuaded that the record demonstrates that the PUD's method of notice was "reasonably calculated" to inform the affected party, the petitioner. Walker, 352 U.S. at 115, 77 S.Ct. 200. The notice was skimpy and even if it had been published or broadcast, it would have done little. No less authority than the United States Supreme Court has said, "mere newspaper publication rarely informs a landowner of proceedings against his property." Id. at 116, 77 S.Ct. 200. Although Walker discussed the propriety of notice to landowners in the context of compensation proceedings, what the Court said about the limitations of publication are insightful: Publication in a newspaper provides little assurance that the affected property owner will receive notice of proceedings that might affect him or her. That insight is no less true here, when this court has not been provided with evidence that the agenda, which did not describe the affected property, was published or broadcast.
¶ 68 I would observe, also, that it would not have been difficult for the PUD to give actual notice to affected property owners. As noted above, the PUD knew who would be affected by their actions and where they were located. Because their identity and whereabouts were known, the necessity of giving notice through publication only was reduced. See, e.g., Mullane, 339 U.S. at 317, 70 S.Ct. 652 ("Thus it has been recognized that, in the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification [publication] is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights."). In short, the giving of actual notice would have been easily accomplished and the interests of the State would not have been overly burdened by giving such notice.[3]
¶ 69 For the foregoing reasons, I believe that the notice given by the PUD did not satisfy the requirements of due process. The PUD was well aware that its condemnation resolution would directly and adversely affect the petitioner's interests, and there is no question that it knew how to find the petitioner. Under these circumstances, merely posting an agenda outside a meeting room and sending it on to local newspapers and radio stations was not a method of notice "reasonably calculated to inform" the petitioner *194 that its property interests were threatened. Walker, 352 U.S. at 115, 77 S.Ct. 200. I would reverse the Court of Appeals.
CHAMBERS, J. (dissenting).
¶ 70 When a municipal government, having failed to first ask permission, is caught with its hand in the public's cookie jar trying to sneak one of the public's cookies, at the very least it must remove its hand from the jar and start from the beginning by properly asking permission. I share many of the concerns regarding government takings expressed by Justice J.M. Johnson in his dissent. The parties, however, neither raise nor argue any constitutional issues. We are presented with arguments based upon statutory infirmities. While this case does not present a good vehicle to discuss constitutional requirements, it presents squarely the proper application of principles of open and responsive government in the context of takings.
¶ 71 Concerned about a potential energy shortage, Public Utility District No. 2 of Grant County, Washington (PUD) acquired 20 diesel generators and put them on 20 leased acres of land adjacent to property already owned by the PUD. During negotiations on the terms of the lease, the PUD made its desire to acquire the property known. Unfortunately, negotiations on this point broke down. The PUD decided instead to acquire 10 of these acres by eminent domain. In July 2003, at a regularly scheduled meeting, the PUD passed Resolution 7643 authorizing the acquisition by eminent domain of the property at issue here.
¶ 72 Public notice of the commission meeting was perfunctory. The PUD's executive secretary declared that she faxed the agenda for the July 14, 2003, commission meeting to local newspapers and radio stations, posted the agenda outside of the commission's meeting room, sent electronic copies to all district employees and individuals who had so requested, and mailed a copy to each of the commissioners. As is unfortunately quite common, as far as I can tell, the agenda merely described Resolution 7643 as "A Resolution Authorizing the Acquisition by Condemnation of Certain Real Property." Clerk's Papers at 665. The agenda neither identified the property owners nor the property to be condemned.
¶ 73 North American Foreign Trade Zone Industries, LLC (NAFTZI), apparently unaware of the meeting or its subject matter, did not appear. Thus, the PUD was able to pass its resolution without any annoyance or interference from the owner of the property which it desired to condemn. The PUD proceeded to file a condemnation petition in Grant County Superior Court and served NAFTZI with a copy of the petition. NAFTZI moved to dismiss the petition, arguing that the PUD failed to provide the public with advance notice of its intent to seek condemnation of NAFTZI's property. The trial judge agreed with NAFTZI and dismissed the petition. However, before the hearing on NAFTZI's motion to dismiss, the PUD placed on the agenda of its December 2003 meeting two alternative resolutions, one ratifying and one repealing Resolution 7643. This time, in addition to the standard notices outlined by the PUD's executive secretary above, the PUD also specifically notified NAFTZI's counsel and published the text of the two proposed resolutions, which did identify the land at issue, in two local newspapers. The commission adopted Resolution 7680, ratifying Resolution 7643.
¶ 74 Having dismissed the PUD's petition for failing to give proper notice, the trial court then reconsidered the motion to dismiss based upon the PUD's subsequent notice and ratification and permitted the petition in condemnation to proceed.
¶ 75 I agree with the trial judge, the Court of Appeals, and Justice J.M. Johnson that the July 2003 Resolution 7643 did not satisfy the statutory notice requirements. In recognition that many local governments would like to conduct business under a cloak of secrecy, the people have spoken through the state legislature to require minimum standards by which local governments must conduct business openly. Regrettably, these bare minimums generally represent the maximum openness local governments afford the citizenry. Through a series of legislative enactments, RCW 8.12.040, RCW 35.22.288, RCW 35.23.221, RCW 35.27.300, and RCW 54.16.020, the legislature requires that before *195 any municipal government takes legislative action deciding to initiate a condemnation proceeding, appropriate notice be given to the public. Under our statutory scheme, such a decision must be made in a public forum where objections from affected citizens may be heard. Nisqually Delta Ass'n v. City of Dupont, 103 Wash.2d 720, 727, 696 P.2d 1222 (1985) ("The purpose of notice statutes is to apprise fairly and sufficiently those who may be affected of the nature and character of an action so they may intelligently prepare for the hearing." (citing Barrie v. Kitsap County, 84 Wash.2d 579, 585, 527 P.2d 1377 (1974))); In re Petition of Puget Sound Power & Light Co., 28 Wash. App. 615, 619, 625 P.2d 723 (1981) (a governmental body exercising its power of eminent domain must "make its decision in a public forum where objections by affected citizens may be heard.").
¶ 76 As Sherlock Holmes might have said to Dr. Watson, "It is elementary, my dear fellow,"[1] that no meaningful public forum is provided citizens without meaningful notice; and in this context, that should include at least a description of the property or general geographical area to be affected. For example, recently we found the notice of the meeting to authorize the condemnation sufficient in part because it contained a description of the neighborhood and street names. Cent. Puget Sound Reg'l Transit Auth. v. Miller, 156 Wash.2d 403, 416-17, 128 P.3d 588 (2006). In another case, notice was deemed insufficient because it contained no mention of condemnation. Port of Edmonds v. Nw. Fur Breeders Coop., Inc., 63 Wash.App. 159, 167-69, 816 P.2d 1268 (1991). Although the PUD's agenda for the July 2003 meeting mentioned condemnation, it contained no geographic details that would fairly apprise those who might be affected so that they could intelligently prepare. See Nisqually Delta Ass'n, 103 Wash.2d at 727, 696 P.2d 1222. Adequate notice is even more critical since the legislative action on Resolution 7643 will likely be deemed conclusive with respect to the issue of public necessity. See In re Petition of Seattle Popular Monorail Auth. v. Seattle Popular Monorail Auth., 155 Wash.2d 612, 629, 121 P.3d 1166 (2005).
¶ 77 Whether or not the PUD succeeded in curing the defect in the July 2003 Resolution 7643 by passing the December 2003 Resolution 7680 is a closer question. The majority is absolutely correct that statutes that delegate the State's sovereign power of eminent domain to its political subdivisions, like municipal corporations, are to be strictly construed. See, e.g., City of Des Moines v. Hemenway, 73 Wash.2d 130, 137, 437 P.2d 171 (1968); majority at 180. In Northwest Fur Breeders, 63 Wash.App. 159, 816 P.2d 1268, the court did not give the Port of Edmonds the option of correcting its failure to give meaningful notice by ratifying the previous ordinance. The logic is sound. If the ordinance is void, then a condemnation action based upon that legislative action is void. The process must be started anew. To permit a fix would not effectuate the legislative intent that there be a meaningful debate in a public forum on any proposed eminent domain ordinance. To permit such a fix simply permits the municipality to leave its hand in the public cookie jar with its fingers firmly around a citizen's cookie while it hurriedly but dutifully goes through a meaningless act of asking permission.
¶ 78 I dissent.
J.M. JOHNSON, J. (dissenting).
¶ 79 Petitioner North American Foreign Trade Zone Industries, LLC (NAFTZI) had its private property condemned by Public Utility District No. 2 of Grant County (PUD), contrary to public notice requirements and without proving public use and necessity. This violates the Washington Constitution.
¶ 80 PUD owns and operates two power dams on the Columbia River in eastern Washington. The cheap hydroelectric power from these dams generated many times the power needed by PUD residents. In the wake of California's 2000 energy crisis, PUD staff forecast huge revenues from selling additional diesel-generated electric power outside Grant County. PUD declared an emergency *196 shortage of energy and purchased 20 diesel generators. These generators were placed on property leased from NAFTZI pursuant to a short-term lease agreement with a renewal option.
¶ 81 Before installation of the generators was even complete, adjustments in the market caused wholesale prices to plummet to levels making diesel generation costs noncompetitive (especially when compared to cheap hydroelectric power). The diesel generators were never used. PUD declined a proposed purchase option with NAFTZI, and after further negotiations for purchase of NAFTZI's property failed, PUD initiated condemnation proceedings.
¶ 82 The initial public notice admittedly did not specify the lots to be considered for condemnation. The agenda vaguely referred to "Condemnation of Certain Real Property." PUD later tried to remedy this defective public notice with a resolution purporting to be retroactive in effect.
¶ 83 The record indicates PUD's proposed use of diesel generators for energy reserve was economically infeasible. PUD faced an economic dilemma due to this poor investment and execution of a short-term lease with NAFTZI. The condemnation of NAFTZI's property was hoped to save PUD costs of the lease or immediate removal of the generators.
¶ 84 Washington Constitution article I, section 3's protections against the taking of property without due process of law requires genuine public notice, which identifies the particular parcels of property to be considered for condemnation. Due process also prohibits retroactive ratification of a defective notice.
¶ 85 Article I, section 16 declares that private property may be taken only for public use, and that the question of a public use is a judicial question "without regard to any legislative assertion." Costs of poor business dealings are not reducing public purpose and cannot justify the exercise of eminent domain power to take private property.
¶ 86 The majority allows a public agency to take private property without proper notice and to condemn without public purpose. The constitutionally limited eminent domain power and important due process safeguards of our constitution are again disregarded. The constitutional right to own property and the public right to notice of its government's proposed actions loses again. I therefore dissent.

ANALYSIS
¶ 87 Washington's declaration of rights clause emphatically asserts:
All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights.
WASH. CONST. art. I, § 1. Our constitution was established in part to protect the right of the people to own and use private property. Article I, section 16 provides for a strictly limited exercise of eminent domain power, subject to close examination by the judicial branch as an essential check and balance:
No private property shall be taken or damaged for public or private use without just compensation having been first made. . . . Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public. . . .
WASH. CONST. art. I, § 16.
¶ 88 Further, the Washington Constitution requires that any governmental interference or deprivation of private property rights must follow procedures and individualized proceedings that are open and orderly: "No person shall be deprived of life, liberty, or property, without due process of law." WASH. CONST. art. I, § 3. Public notice procedures required for initiating condemnation proceedings must comply with due process.
¶ 89 Municipal corporations such as the PUD here do not have any inherent power of eminent domain. Rather, municipal corporations and agencies may exercise such power only when expressly authorized to do so by *197 the state legislature and must act in strict accord with such delegation. See, e.g., State ex rel. Tacoma Sch. Dist. v. Stojack, 53 Wash.2d 55, 60, 330 P.2d 567 (1958); Teply v. Sumerlin, 46 Wash.2d 504, 507, 282 P.2d 827 (1955). Because statutes conferring condemnation power are in derogation of private property rights, such statutes must be strictly construed both as to the extent and as to the manner of their exercise. State ex rel. King County v. Superior Court, 33 Wash.2d 76, 82, 204 P.2d 514 (1949); State ex rel. Postal Tel. Cable Co. v. Superior Court, 64 Wash. 189, 193, 116 P. 855 (1911).[1]
¶ 90 Because constitutional rights of a property owner are implicated, the burden of proof is on the condemning agency to demonstrate that the condemnation is for a public use and that the taking is necessary for that public use. State ex rel. Wash. State Convention & Trade Ctr. v. Evans, 136 Wash.2d 811, 822-23, 966 P.2d 1252 (1998) (Convention Ctr.); King County v. Theilman, 59 Wash.2d 586, 369 P.2d 503 (1962). The burden of proof rests on the condemning agency to demonstrate proper notice to the owner and to the public. See Cent. Puget Sound Reg'l Transit Auth. v. Miller, 156 Wash.2d 403, 426, 128 P.3d 588 (2006) (J.M. Johnson, J., dissenting).
A. Notice Procedures
¶ 91 The majority admits that public notice statutes apply to public utility districts. See majority at 181. But the majority wrongly concludes PUD here followed proper notice procedures. Id. at 200. Because PUD did not comply with required notice procedures nor satisfy due process, we would reverse the Court of Appeals and dismiss the proceedings initiated by Resolution 7643.
¶ 92 Due process demands that government give notice when it seeks to take property. Miller, 156 Wash.2d at 423, 128 P.3d 588 (Alexander, C.J., dissenting). " `[A] proper hearing can be no greater protection for the public and the individual landowner than the opportunity afforded by the notice to take an informed part therein.'" Id. at 424, 128 P.3d 588 (Alexander, C.J., dissenting) (quoting Glaspey & Sons, Inc. v. Conrad, 83 Wash.2d 707, 713, 521 P.2d 1173 (1974)). "When interested parties are ill-informed of government proposals, `the public at large will be deprived of an `informed' resolution of problems that are the subject of the hearing.'" Id. at 424-25, 128 P.3d 588 (Alexander, C.J., dissenting) (quoting Conrad, 83 Wash.2d at 713, 521 P.2d 1173).
¶ 93 Because statutes delegating eminent domain power are in derogation of the people's rights, King County, 33 Wash.2d at 82, 204 P.2d 514, a condemning agency must establish that all public notice requirements were fulfilled. We therefore take strong exception with the majority's contention that the challenger, NAFTZI, bears the burden of proof that the notice was defective. Majority at 180-81. Procedural errors, such as lack of proper notice, are questions of law reviewed de novo. State v. Harris, 114 Wash.2d 419, 441, 789 P.2d 60 (1990).
¶ 94 If the condemning entity fails to give proper notice, a judgment of public use and necessity is void and the eminent domain process must begin anew. Port of Edmonds v. Nw. Fur Breeders Coop., Inc., 63 Wash. App. 159, 169, 816 P.2d 1268 (1991). See also Deaconess Hosp. v. Wash. State Highway Comm'n, 66 Wash.2d 378, 405, 403 P.2d 54 (1965) (noting that failure to give notice constitutes arbitrary and capricious conduct).
¶ 95 When a city or town decides to condemn property, it must do so by ordinance preceded by public hearings in which affected citizens may be heard. RCW 54.16.020 requires the PUD to follow the "procedure" utilized by cities and towns in enacting an ordinance to condemn property. The "procedure" may include, but is not limited to, written notification in an official newspaper, posting of upcoming meeting agendas, or such other processes which satisfy the intent *198 of this requirement.[2] "Agencies and municipal corporations must comply with internal procedures that are promulgated pursuant to statutory requirement. Compliance is a necessary implication of a statutory mandate." Miller, 156 Wash.2d at 432, 128 P.3d 588 (J.M. Johnson, J., dissenting).
¶ 96 Because such statutes affect constitutional rights of private property, "effective notice must require that the agenda fairly apprise a reasonable person of the actual land under consideration for condemnation." Id. at 434, 128 P.3d 588 (J.M. Johnson, J., dissenting).
¶ 97 Prior to enactment of Resolution 7643, the PUD apparently used no established procedure for notifying the public of the hearing or the agenda.[3] The agenda itself did not identify NAFTZI's property but made a vague reference to "Condemnation of Certain Real Property." Clerk's Papers (CP) at 665. This is surely not meaningful advance notice of the intended action to take this property either to the owner or to the public. PUD's "Petition in Condemnation" should have been dismissed as a matter of law.[4]
¶ 98 PUD's assertion that later Resolution 7680, enacted on December 29, 2003, while the condemnation action was pending, somehow retroactively ratified Resolution 7643, is unsupportable. There are no condemnation cases cited by PUD (or by the majority) that allow a condemning authority to ratify an earlier, void ordinance commencing condemnation. Washington cases do not allow "retroactive" curing of such defects.
¶ 99 Even if later Resolution 7680 was proper, its "curing" of Resolution 7643 could only be effective as of the date of the passage of the later resolution. This alone requires dismissal of the pending action and commencement of a new proceeding based upon a properly enacted ordinance, and only if notice was proper for that ordinance.[5]
¶ 100 Lacking requisite public notice and opportunity for citizens' voices to be heard, Resolution 7643 cannot form the basis of the condemnation proceeding. Resolution 7643, the jurisdictional prerequisite to this condemnation proceeding, was void. Our precedent holds that if a condemning agency lacks jurisdiction to order condemnation, the superior court similarly lacks jurisdiction to entertain the condemnation proceedings. State ex rel. Cation v. Superior Court, 110 Wash. 506, 509, 188 P. 546 (1920) (holding that if a board has jurisdiction, "it must be by reason of the recitals that due notice had been given," and that "if the board had no jurisdiction to make the order directing the condemning of plaintiff's lands, then the superior court had no jurisdiction to entertain the condemnation proceedings"); State ex rel. Davies v. Superior Court, 102 Wash. 395, 397, 173 P. 189 (1918) (finding notice to be "necessary to give the court jurisdiction"); Chehalis County v. Ellingson, 21 Wash. 638, 645, 59 P. 485 (1899) ("before owners' property can be subjected to the use of the public, notice must be given of all the essential steps"), overruled on other grounds by Spokane & I. Lumber Co. v. Stanley, 25 Wash. 653, 66 P. 92 (1901).
B. Public Necessity
¶ 101 We also disagree with the majority's conclusion that PUD acted with a proper public purpose under article I, section 16 of our constitution. We would hold the record *199 does not establish a public purpose to justify taking NAFTZI's property.
¶ 102 The Washington Constitution affirms that "governments . . . are established to protect and maintain individual rights," WASH. CONST. art. I, § 1, including rights to own and use property. Exercise of eminent domain power is limited:
No private property shall be taken or damaged for public or private use without just compensation having been first made. . . . Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public. . . .
WASH. CONST. art. I, § 16. Placement of this provision in article I, declaration of rights, evidences the primacy of the right to own private property and the strictly limited scope of the eminent domain power. "History demonstrates these words of article I, section 16, were carefully chosen to strengthen our guarantee over rejected language from other state constitutions . . . affording our residents enhanced constitutional guarantees against injustice and oppression." Convention Ctr., 136 Wash.2d at 830, 966 P.2d 1252 (Sanders, J., dissenting).
¶ 103 Article I, section 16 requires a judicial "public use" inquiry. See State ex rel. Puget Sound Power & Light Co. v. Superior Court, 133 Wash. 308, 311, 233 P. 651 (1925). To determine whether a use of the eminent domain power is permissible, courts must ascertain "(1) the use is public; (2) the public interest requires it; and (3) the property appropriated is necessary for that purpose." Convention Ctr., 136 Wash.2d at 817, 966 P.2d 1252. The public interest and necessity inquiries are judicial corollaries providing enforcement of the constitutional mandate. Here, property is taken so unused diesel generators may be stored until buyers remove them.
¶ 104 Municipal corporations may exercise such condemnation power only when expressly authorized and in strict accord with such delegation. See, e.g., Stojack, 53 Wash.2d at 60, 330 P.2d 567; Teply, 46 Wash.2d at 507, 282 P.2d 827. Because constitutional rights of a property owner are implicated, the burden of proof is on the condemning agency to demonstrate the condemnation is for a public use and that the taking is necessary for that public use. Convention Ctr., 136 Wash.2d at 822-23, 966 P.2d 1252; Theilman, 59 Wash.2d 586, 369 P.2d 503; Sternoff, 52 Wash.2d 282, 325 P.2d 300. Washington "has a long history of extending greater protections [to its citizens] against governmental takings of private property by literally defining what constitutes `private use.'" Manufactured Hous. Cmtys. v. State, 142 Wash.2d 347, 359, 13 P.3d 183 (2000).
¶ 105 The majority asserts that agency determinations of public necessity are "`conclusive in the absence of proof of actual fraud or arbitrary and capricious conduct, as would constitute constructive fraud.'" Majority at 185 (quoting HTK Mgmt. L.L.C. v. Seattle Popular Monorail Auth., 155 Wash.2d 612, 629, 121 P.3d 1166 (2005)). This analysis disregards the constitutional mandate of article I, section 16 for a searching judicial examination of public purpose "without regard to any legislative assertion." Article I, section 16's use of the word "shall" is imperative and operates to create a duty on the courts. See, e.g., Crown Cascade, Inc. v. O'Neal, 100 Wash.2d 256, 668 P.2d 585 (1983). See also WASH. CONST. art. I, § 29 ("The provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise.").
¶ 106 The PUD's loss-cutting does not constitute a public purpose, even if some public benefit is argued. See In re Petition of Seattle (Westlake), 96 Wash.2d 616, 627, 638 P.2d 549 (1981) ("A beneficial use is not necessarily a public use"). A "public use" must be "either a use by the public, or by some agency which is quasi public, and not simply a use which may incidentally or indirectly promote the public interest or general prosperity of the state." Healy Lumber Co. v. Morris, 33 Wash. 490, 509, 74 P. 681 (1903).
¶ 107 Further, "[i]f a private use is combined with a public use in such a way that the two cannot be separated, the right of *200 eminent domain cannot be invoked." Westlake, 96 Wash.2d at 627, 638 P.2d 549. "Where the condemned property is to be devoted to both a private and a public use, the constitutional prohibition [against taking private property for private use] has no less force." Convention Ctr., 136 Wash.2d at 825, 966 P.2d 1252 (Sanders, J., dissenting).
¶ 108 Here, the trial court assumed a public use through an overly deferential standard, declining to undertake a searching analysis of evidence of "public necessity." The trial court also ignored important evidence suggesting an improper purpose for PUD's exercise of eminent domain power (i.e., because its lease turned out to be costly). Argued economic benefit is not automatically a legitimate public purpose justifying condemnation under article I, section 16.
¶ 109 The record shows PUD purchased 20 diesel generators in the wake of California's energy crisis of late 2000-2001. PUD staff hoped to achieve substantial revenue from selling power. CP at 508. Before installation was even complete, wholesale power prices plummeted. PUD canceled the diesel generation contracts in July 2001, and the diesel farm never operated. By August 8, 2002, a PUD memo concluded, "[w]ith current market prices and reserve requirements providing reserves with the diesels is not economical." CP at 110. A later memo warned PUD commissioners of the "large identifiable item" on the financial statements if the generators were sold. CP at 186. The loss on the sale of the generators would be highly visible, causing the PUD to face justifiable public criticism. Id.
¶ 110 Substantial evidence indicates that the argument diesel generation could serve as a "reserve" energy source was false, and only post facto justification for condemnation. The trial court conceded that any use of the generators as reserves "might be a remote possibility."[6] Indeed, PUD has the power dam generating capacity of over 2,000 megawatts of electricity, many times more than needed to supply all district residents and enough to supply a city the size of Seattle. It already sells its electric power to other northwest utilities serving millions of customers.
¶ 111 However, no extensive analysis of the "public use and necessity" was undertaken. Instead, the trial court narrowly framed the issue: "is this a public use and necessity to keep these generators at the current location, even if we assume that it wasn't a wise choice to purchase." 2 Verbatim Report of Proceedings (VRP) (Apr. 1, 2004) at 93. This lax review standard led the trial court to approve PUD's condemnation as a public necessity by deferring to the PUD "Declaration of Emergency" and the claim that "[t]hey've done a cost analysis" from which PUD staff concluded they needed "to keep these generators at this location and therefore condemn the property." Id. at 94-95.
¶ 112 The trial court recognized PUD's problem was the purchase of unneeded diesel generators and their placement on leased land. The trial court acknowledged that if it were to "disallow the condemnation, it would, in effect, require the PUD to remove these items and place them elsewhere." Id. at 94.
¶ 113 PUD's dilemma was a direct, bargained-for consequence of its short-term lease agreement with NAFTZI. An ill-fated investment in diesel generators located upon leased land is not a "public use" justifying condemnation of private property. Separately, article XI, section 13 of the Washington Constitution prohibits public and municipal corporations from exercising eminent domain power to satisfy debt. This analogous effort to minimize costs from PUD contractual obligations also does not constitute a valid public purpose.
¶ 114 A harshly criticized majority of the United States Supreme Court has held that mere "economic development" could be a permissible "public use" under the federal constitution. That does not dictate that this court reach a similar conclusion under the more protective provisions of the Washington Constitution. See U.S. CONST. amend. V; cf. Kelo v. City of New London, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005). Washington Constitution article I, section 16 offers stronger protections of private property *201 rights and more stringent procedural restrictions on the exercise of eminent domain power. Here, private property was taken for no public purpose, and the majority errs in holding otherwise.
¶ 115 Here, even the trial court only upheld PUD on reconsideration, a trial court order further undermined by the lack of findings. This trial court made no specific finding of public use and no finding that the public interest requires this condemnation. Rather, the trial court simply deferred to the PUD, and the majority repeats that error.
¶ 116 Condemnation of private property implicates a constitutional right, and adjudication of public use and necessity involves the "three interrelated essential findings" of public use, public interest, and public necessity. State ex rel. Lange v. Superior Court, 61 Wash.2d 153, 156, 377 P.2d 425 (1963). Due process demands that trial courts reviewing condemnation petitions should enter specific findings for public use, public interest, and public necessity. See Miller, 156 Wash.2d at 428, 128 P.3d 588 (J.M. Johnson, J., dissenting).
¶ 117 When government deprives law-abiding property owners of their private property, due process requirements of article I, section 3 demand that clear written findings be entered by a trial court. Judicial review of government takings as required by article I, section 16 is impossible without such a written decision below. The majority gives complete deference to agencies and trial court judges, majority at 186-87 n. 20. But our constitution was written to protect the rights of individuals, not the convenience of agencies and courts. The entering of findings generates a record necessary for safeguarding property owners' constitutional rights on appellate review.
¶ 118 This lack of a serious judicial review of a condemning agency's exercise of eminent domain powers results from the excessively deferential standard the majority reaffirms today. Judicial review lite will never suffice to protect constitutional rights and was surely not intended in our constitution. Express constitutional safeguards of article I, section 16 protecting those rights require honest judicial review.

CONCLUSION
¶ 119 The majority today permits a public agency to take private property without proper notice and to condemn without provable public purpose. The limited eminent domain power and important due process safeguards of our constitution are undermined so long as the courts thus ignore the mandates of article I, sections 3 and 16. The constitutional right to own property and the public right to notice of governmental action loses again. I therefore dissent.
I CONCUR: RICHARD B. SANDERS, J.
NOTES
[] Pacific Northwest Bank was a respondent in the trial court but is not a party on appeal.
[1] NAFTZI is a subsidiary of Aero-Space Port International Group (ASPI).
[2] In a memorandum dated April 6, 2001, the acting manager of PUD discussed several options for acquiring the property, referring to condemnation as a less desirable option than outright purchase, and mentioned discussions that PUD had with NAFTZI about including a purchase option in the lease. He further stated that PUD did not agree with NAFTZI about the property's value. Also, PUD's regulatory compliance coordinator wrote to ASPI's corporate counsel on May 23, 2003, and made explicit references to ongoing discussions between PUD and NAFTZI regarding a purchase price for the property. Thus, the dispute here was not about whether the landowner or the public received adequate notice of the condemnation; it was about the price NAFTZI was asking for the property.
[3] One dissent mischaracterizes several facts related to the lease. First, it states that PUD "canceled and bought out separate diesel generation contracts," but it fails to indicate that those contracts were unrelated to NAFTZI's property. Dissent (J.M. Johnson, J.) at 196, 200. Second, it states that PUD "declined a proposed purchase option with NAFTZI." Id. at 178. It is unclear what proposed purchase the dissent is referring to. PUD exercised the renewal option that was included in the lease, and there was no purchase option to exercise because, as noted above, the lease did not include a purchase option. Third, it states that PUD condemned NAFTZI's property to save the financial costs of removing the generators or "negotiated lease." Id. It is unclear what the reference to "negotiated lease" means. At any rate, the record shows that PUD negotiated at length with NAFTZI to purchase the property before resorting to a condemnation action, and the cost associated with removing the generators was only one of the reasons PUD sought the property.
[4] Public utility districts exercise their statutory powers though a commission. RCW 54.12.010.
[5] One dissent erroneously asserts that PUD "apparently used no established procedure for notifying the public of the hearing or the preliminary agenda." Dissent (J.M. Johnson, J.) at 198. The executive secretary's statement clearly indicates she followed her routine procedure.
[6] Public utility commissions carry out their objectives by resolution rather than by ordinance. RCW 54.16.020, .190.
[7] The statutes referenced by NAFTZI relate to notice for adoption of ordinances. The statutes governing first class cities, unclassified cities, towns, and second class cities employ identical language. See RCW 35.22.288 (first class cities); RCW 35.30.018 (unclassified cities); RCW 35.27.300 (towns); RCW 35.23.221 (second class cities). To quote just one example, RCW 35.22.288 states that

[e]very city shall establish a procedure for notifying the public of upcoming hearings and the preliminary agenda for the forthcoming council meeting. Such procedure may include, but not be limited to, written notification to the city's official newspaper, publication of a notice in the official newspaper, posting of upcoming council meeting agendas, or such other processes as the city determines will satisfy the intent of this requirement.
[8] The first resolution was titled "A Resolution Ratifying Resolution No. 7643 Relating to the Acquisition by Condemnation of Certain Real Property for Use as a Diesel Generation Site." CP at 666 (bold and upper case omitted). The second resolution was titled "A Resolution Repealing Resolution No. 7643 and Directing the District's Counsel to Dismiss the Pending Condemnation Action of Certain Real Property for Use as a Diesel Generation Site." Id. (bold and upper case omitted).
[9] One dissent highlights the fact that the trial court only upheld the condemnation on reconsideration, but does not explain why it matters. Dissent (J.M. Johnson, J.) at 201. This dissent appears to confuse the trial court's ruling regarding the adequacy of notice for the commission meeting with its public use and necessity determination. As this dissent acknowledges, the ruling regarding the meeting notice merely established the court's jurisdiction to hear the public use and necessity issue. Dissent (J.M. Johnson, J.) at 198. Because we conclude the notice was adequate, the court did have jurisdiction. The fact that the trial court reached this conclusion only on reconsideration is irrelevant.
[10] NAFTZI also commenced an unlawful detainer action against PUD that the trial court consolidated with the condemnation action and stayed during this appeal.
[11] Justice J.M. Johnson erroneously asserts that the burden of proof for the public hearing to authorize condemnation derives from the burden of proof at the public use and necessity hearing. Dissent (J.M. Johnson, J.) at 197. However, the only authority cited for this proposition is his own dissenting opinion in Central Puget Sound Regional Transit Authority v. Miller, 156 Wash.2d 403, 429 n. 14, 128 P.3d 588 (2006) (J.M. Johnson, J., dissenting). This claim is part of his continuing effort to "constitutionalize" the notice requirement for public meetings by conflating the public meeting authorizing condemnation and the judicial hearing on the condemnation action.
[12] We note that statutes governing other entities contain similar language referencing procedures applicable to cities and towns for the exercise of eminent domain powers. See RCW 35.58.210 (metropolitan municipal corporations); RCW 36.57A.100 (public transportation benefit areas); RCW 53.25.190 (industrial development districts); RCW 57.08.005 (water-sewer districts); RCW 81.112.080-.090 (regional transit authorities).
[13] RCW 54.16.020 states, in pertinent part, that "[t]he right of eminent domain shall be exercised pursuant to resolution of the commission and conducted in the same manner and by the same procedures as is provided for the exercise of that power by cities and towns of the state in the acquisition of like property and property rights." (emphasis added). The enabling statute for port districts, RCW 53.08.010, states, in pertinent part that "[a] port district . . . may exercise the right of eminent domain . . . and such right shall be exercised in the same manner and by the same procedure as provided for cities of the first class. . . ." (emphasis added).
[14] All four statutes contain the identical language regarding the notice procedures for hearings to discuss proposed ordinances. As a representative example, RCW 35.22.288 states that the procedures "may include, but not be limited to, written notification to the city's official newspaper, publication of a notice in the official newspaper, posting of upcoming council meeting agendas, or such other processes as the city determines will satisfy the intent of this requirement."
[15] Two of the dissenting opinions also make the extraordinary claim that due process requires actual notice at this stage because PUD's determination of necessity in Resolution 7643 will be deemed conclusive in the judicial condemnation proceeding. Dissent (Chambers, J.) at 195; dissent (Alexander, C.J.) at 191-92. It is disconcerting that these dissents apparently believe the trial court's deference on the necessity issue renders a significant portion of the judicial condemnation proceeding a nullity. It is of more concern that they would insert requirements into the statute even though NAFTZI does not challenge the constitutional validity of the statute. NAFTZI merely claims that it did not receive notice the statute requires. Pet. for Review at 8-10.
[16] Several of the cases that Chief Justice Alexander cites involve challenges to the constitutionality of the notice statute, which have no bearing here because NAFTZI did not challenge the statute. As noted, NAFTZI only claims that PUD failed to follow the statutory notice requirements. See Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 799, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983) (mortgagee challenged a statute that did not require notice to the mortgagee of the sale of the mortgaged property for delinquent property taxes); Fuentes v. Shevin, 407 U.S. 67, 81, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (petitioners challenged constitutionality of statutes allowing the state to summarily seize goods purchased subject to conditional sales contracts); Schroeder v. City of New York, 371 U.S. 208, 212, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962) (plaintiff challenged a statute permitting notice by publication for judicial proceeding to condemn property for the New York water system); Walker v. City of Hutchinson, 352 U.S. 112, 115, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956) (appellant challenged a statute permitting notice by publication for proceeding to fix compensation for condemnations); City of Everett v. Slade, 83 Wash.2d 80, 84, 515 P.2d 1295 (1973) (man whose vehicle was seized when he was arrested for a drug crime challenged a statute that permitted the city to summarily seize property without notice or an opportunity for a hearing).

Chief Justice Alexander also cites cases that involve constitutional challenges to nonstatutory notice, even though NAFTZI raised a constitutional challenge only regarding the public use and necessity determination. See Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 315, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (plaintiff challenged the constitutional sufficiency of notice by publication to beneficiaries of a common trust fund for settlement of fund's first account); City of Tukwila v. King County, 78 Wash.2d 34, 38, 469 P.2d 878 (1970) (county challenged sufficiency of notice to landowners adjacent to the area that the city had annexed; the court held that even defective notice by publication was sufficient to provide surrounding landowners a chance to be heard).
[17] Miller, 156 Wash.2d at 423, 128 P.3d 588 (J.M. Johnson, J., dissenting); Miller, 156 Wash.2d at 423-24, 128 P.3d 588 (Alexander, C.J., dissenting) (citing Glaspey & Sons, Inc. v. Conrad, 83 Wash.2d 707, 713, 521 P.2d 1173 (1974) (notice was insufficient because although the original ordinance was made available at the zoning board's office before the meeting, the board made changes to them that were not available to the public until the meeting took place)).
[18] One dissent claims that PUD was "caught with its hand in the public's cookie jar trying to sneak one of the public's cookies," without properly asking permission, when it enacted Resolution 7643. Dissent (Chambers, J.) at 194, 195 (emphasis added). It concludes, therefore, that PUD should have started over rather than adopting Resolution 7680. The analogy is inapt. The public did not own the "cookie jar" that PUD sought; NAFTZI owned it. The public does not grant permission to take a "cookie" at the meeting to authorize condemnation; it merely has the opportunity to be heard on the issue. In fact, the decision to take the "cookie" does not occur at the public meeting at all; it occurs at the judicial hearing for the condemnation action. The analogy conflates the public meeting authorizing condemnation and the judicial hearing on the condemnation action.
[19] Article I, section 16 of the state constitution states, "[w]henever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public."
[20] As noted earlier, Resolution 7643 expressly states that the purpose of the condemnation was to generate electric current for its customers. PUD also produced declarations regarding fluctuations in demand for electricity, reserve load requirements, the tentative nature of its forecasts for hydroelectric power, and the backup role the generators would serve in cases of power interruption from other sources. One dissent claims that the trial court "assumed a public use" and ignored "important evidence" suggesting an improper purpose for the condemnation. Dissent (J.M. Johnson, J.) at 199-200. The record shows that the trial court heard extensive evidence on the public use issue from both parties before rendering its decision. The fact that the trial court did not explicitly set out its reasons for concluding that the use was public does not mean it assumed the use was public.
[21] One dissent makes a vague reference to the "nonpublic use to which this property will be devoted." Dissent (J.M. Johnson, J.) at 200-01. It is unclear what is the nonpublic use being referenced. NAFTZI never alleged that a non-public entity would use or benefit from the property.
[22] Justice J.M. Johnson's dissent continues to conflate the public use and necessity determinations, arguing that the more deferential test we apply to necessity determinations ignores the mandate in article I, section 16 for a judicial determination. Dissent (J.M. Johnson, J.) at 199. However, as noted supra footnote 15, article I, section 16 states only that the public use determination is a judicial question. In addition, as this dissent acknowledges, the test we apply to determine necessity is one we have applied consistently for over 50 years. Id. (citing Seattle Popular Monorail Auth., 155 Wash.2d at 629, 121 P.3d 1166 (citing Hemenway, 73 Wash.2d at 139, 437 P.2d 171; City of Tacoma v. Welcker, 65 Wash.2d 677, 684, 399 P.2d 330 (1965); State ex rel. Church v. Superior Court, 40 Wash.2d 90, 91, 240 P.2d 1208 (1952))). This dissent also argues that due process demands that trial courts enter specific findings of public use and necessity. Id. at 17, 240 P.2d 1208. Again, however, the only authority cited for this proposition is the dissent in Miller. Id. We are not aware of any controlling authority requiring a trial court to set out the specific facts on which the court relied in reaching its determinations of public use and necessity.
[23] One dissent asserts that substantial evidence indicated that the necessity of using the diesel generators for reserves was a "post facto justification" for condemnation and that the trial court's review standard was lax. Dissent (J.M. Johnson, J.) at 200. The prudence of the initial decision to purchase the generators is irrelevant to the question of whether the condemnation was necessary. The trial court correctly recognized that the parties' focus on PUD's decision to purchase the generators inappropriately diverted the focus of the inquiry from the question of whether it was necessary to condemn the land once the generators were already there. RP (Apr. 1, 2004) at 92. The trial court's review standard was not lax merely because, after hearing evidence from both parties, it did not accept NAFTZI's claim that PUD had used the generators as a pretext for the condemnation or because it took the cost to remove the generators into consideration when it made its necessity determination.
[1] "Grant County PUD is a consumer-owned utility. It was created in 1938 by a popular vote of the people of the county who had been struggling for 20 years to receive electricity. Grant County is a rural, predominantly agricultural region. The ability to maintain local control of power resources has allowed the county to grow and prosper. Low cost power provided by the Grant County PUD allows the county to be a leading player in the agricultural sector of Washington State and a driving force in regional and state economies." Grant County Pub. Util. Dist., http:// www.gcpud.org/aboutus.htm (last visited Jan. 29, 2007).
[1] Indeed, the majority asserts at length that the due process issue is not properly before us because NAFTZI did not challenge the constitutionality of the State's notice statute. Majority at 182-83. Yet NAFTZI reminded this court that we must look beyond the statute itself and determine whether the notifying agency met the statute's intent. Br. of Appellant at 17. Furthermore, NAFTZI cited In re Petition of Puget Sound Power & Light Co., 28 Wash.App. 615, 619, 625 P.2d 723 (1981), for the proposition that "[d]ue process requires that an individual be given an opportunity for a hearing before he is deprived of any significant property interest." Br. of Appellant at 16. Thus, we are fairly presented with the issue of whether NAFTZI was "deprived of any significant property interest" when the public utility district commission passed a resolution declaring a public necessity to condemn its property and, if so, whether a hearing opportunity was provided. The majority makes no mention of the amicus arguments regarding due process.
[2] The majority mischaracterizes this point. I do not suggest that the conclusive effect given to public necessity determinations "renders a significant portion of the judicial condemnation proceeding a nullity." Majority at 183 n. 15. Rather, I simply point out that such determinations "directly and adversely" affect the property interests of the affected owners. At the public hearing stage, a property owner still can try to dissuade agency decision-makers from declaring a public necessity for condemnation based on any number of policy considerations including fairness, loss of tax revenue, and environmental or other concerns. Once a necessity determination is made, however, the affected property owner is powerless to challenge it, absent evidence of actual or constructive fraud by the agency. Thus, the owner is placed in a significantly less advantageous position in trying to resist condemnation. In my view, that is a tangible, "direct and adverse" impact that triggers due process rights.
[3] Further, I note that the minimal burden this places on the State would not overwhelm the balancing test even if ascertaining the identity and location of all affected property owners was a more substantial task for PUD. It might be one more step in an already lengthy process to give actual notice. But such costs come with upholding procedural due process: "Procedural due process is not intended to promote efficiency or accommodate all possible interests: it is intended to protect the particular interests of the person whose possessions are about to be taken." Fuentes v. Shevin, 407 U.S. 67, 90 n. 22, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).
[1] Wikipedia, http://en.wikipedia.org/wiki/ Sherlock_Holmes (last visited Jan. 29, 2007).
[1] All delegations of state authority are to be construed strictly, and this is "`especially true with respect to the power of eminent domain, which is more harsh and peremptory in its exercise and operation than any other.'" State ex rel. Chesterley v. Superior Court, 19 Wash.2d 791, 800, 144 P.2d 916 (1944) (quoting 1 John Lewis, A Treatise on the Laws of Eminent Domain § 388, at 708 (3d ed.1909)).
[2] RCW 35.30.018 (pertaining to unclassified cities); RCW 35.27.300 (pertaining to towns); RCW 35.23.221 (pertaining to second class cities); and RCW 35.22.288 (pertaining to first class cities).
[3] "PUD's counsel later argued the agenda's reference to the proposed resolution satisfied the court's notice concerns because the public could inspect the proposed resolution as part of the PUD's public record, but we could not find that process explained." Grant County Pub. Util. Dist. No. 2 v. North Am. Foreign Trade Zone Indus., L.L.C., 125 Wash.App. 622, 626-27, 105 P.3d 441 (2005).
[4] The trial court initially dismissed the "Petition in Condemnation" at the January 15, 2004, hearing. 1 Verbatim Report of Proceedings (VRP) (Jan. 15, 2004) at 30.
[5] See Port of Edmonds, 63 Wash.App. at 169, 816 P.2d 1268 ("Because the Port gave inadequate notice, it must begin the eminent domain process anew."). Limiting the opportunity to be heard on legislation authorizing condemnation until after a proceeding has been commenced denies due process.
[6] 2 VRP (Apr. 1, 2004) at 94.